It is contended that there is an irreconcilable conflict between the original opinion in this case and the *Page 699 
principles announced by this court in the later case of Price v.United States, 101 P. 1036. If this contention is correct, then this court should recede from its position in the one case or the other.
The gravity of the case and the importance of the question raised has caused the members of this court to re-examine thoroughly the grounds upon which these two cases rest to discover if there is any conflict between them, and, if so, which decision is best supported by reason and authority. Upon this examination we have failed to find any conflict in the principles upon which both cases rest. In both cases it is held that expert evidence should not be received as to matters coming within the common experience of mankind, with reference to which one man is as competent to speak and his opinion is as good as that of another. As to this principle the two cases are agreed. The seeming conflict grows out of the fact that in the Price Case the admission of the opinions of the doctors that the arm of the deceased was hanging down by his side at the time that he received the fatal wound, which opinion was based upon the range of the ball through the body of the deceased, was held to be reversible error, because the evidence was not only incompetent, but was upon a pivotal point in the case which might have been decided by the jury in favor of or against the defendant. This point also directly involved the guilt or innocence of the defendant. The incompetent evidence objected to contradicted the evidence for the defense. The evidence of the defendant's guilt was by no means clear, satisfactory and free from doubt. An examination of the Price Case will show that without the testimony of the doctors, complained of, there was very little evidence of the guilt of the defendant. It was therefore clear to this court that the jury was influenced by this improper testimony, and, as both error and injury therefrom appeared upon the face of the record, we were compelled to reverse the conviction and grant a new trial.
In this case an entirely different condition of affairs is *Page 700 
presented in the record. It is sought to reverse the conviction because two physicians testified that in their opinions the wounds which caused the death of the deceased were not self-inflicted. There is not a single fact in this record, testified to by any one from which a sane jury could draw the conclusion that these wounds were self-inflicted. If it had been possible for the deceased to have inflicted these wounds upon herself, it was clearly the duty of the eminent counsel for the defendant to have made that possibility appear. Their names are an absolute guarantee that nothing was overlooked or forgotten which would even remotely assist in the defense of their client. This court can safely rest upon the ground that no mistakes were made by counsel for the defense in this case, and that the reason why they did not attempt to show how the wounds upon deceased could have been self-inflicted was because they had found from actual experiments that the thing was a physical impossibility. The admitted facts are that the deceased was a stout, robust woman and weighed over 200 pounds. One shot entered under and behind the left arm and came out near the left nipple. The other ball entered about one inch below the left ear, ranged over the tongue and came out of the right cheek. That when a pistol is discharged with the muzzle against or near to the flesh of a human being, the skin will be black and badly discolored and there will be an orifice there much larger than the bullet or end of the pistol. These conditions did not exist as to the wounds on the neck of the deceased.
These are a few of the undisputed facts that appear in this record. How could these things be true and it be possible for the deceased to have inflicted these wounds upon herself? The undisputed facts of the case proved conclusively that it was impossible. If it had been possible for the deceased, being a stout woman, to reach around and shoot herself under the left ear, holding the pistol so far away from her neck as not to produce the condition described by the undisputed evidence in the record, then how could it be possible, while suffering from *Page 701 
the shock of the first wound, for the deceased to reach around her stout body and fire the shot that went under and behind her left arm and came out about the left nipple, and hold the pistol so far away from her body as not to burn her clothing. The same would be true if the wound under the left arm was made by the first shot. As there was no evidence which might have reasonably caused the jury to believe that the wounds upon deceased were self-inflicted, or might have raised a reasonable doubt upon this subject, then the statement of the doctors that in their judgment the wounds were not self-inflicted, while improperly admitted as evidence, was clearly harmless, because they did not contradict any possible conclusion that might have been rationally arrived at by the jury in favor of the defendant.
This brings us to consider the question as to whether the doctrine of harmless error is founded in justice and supported by reason, and as to whether it should be enforced by the courts. All lawyers will agree that there is such a thing as error without injury. But few, if any, of them will admit that the doctrine of harmless error should be applied to any of their cases. It required the passage of over six years before a member of this court could realize that this doctrine had been properly applied to one of his cases. The more we reflect upon the doctrine of harmless error the more clearly we will see that it is in strict harmony with the philosophy of the law, and that its recognition and enforcement by the appellate court is absolutely necessary for the administration of justice. The admission of the class of expert evidence condemned in both cases was held in this case to be harmless error and in the Price Case to be reversible error. Both cases held that the class of alleged expert evidence complained of is improper, and they also both recognize the doctrine of harmless error. Wherein, then, is the conflict in principles between them? If one is right, then the other is right also. If one is wrong, the other is wrong also, unless there is error in the one case or the other in the application of the principles which both announce. *Page 702 
Even under the most strict interpretation of the common law, mathematical certainty of guilt is never required before legal punishment is inflicted. Moral certainty is all that is required. Any other rule would defeat the enforcement of the law. The wisest and best men are painfully conscious of the fact that it is always possible that they may be mistaken as to their most cherished opinions. Owing to the imperfections of sight, and of memory and the inherent defects of the human mind, the most careful and truthful men are often mistaken in their statements of transactions occurring in their presence. Perfection is not an attribute of human nature. Hence it is always possible that mistakes may be made in the trial of any given cause. In fact it may well be doubted if a closely contested case was ever tried without the commission of some error of minor or greater importance. Therefore, if every case in which any error is committed must be reversed, but few, if any, convictions could stand, and law would become a farce and we would be involved in anarchy.
If, upon appeal, the only question to be decided was as to whether or not any error had been committed upon the trial of the case in the court below, without reference to the question of the guilt of the defendant, then the trial judge would be the real defendant and would be upon trial on the appeal, and the guilt of the defendant would become immaterial. Certainly no sane and impartial man should contend for a doctrine which would be so subversive of justice and which would result in such ruinous consequences to the enforcement of criminal law. It would make our courts a mockery, a snare and a delusion. Justice demands that in the administration of law its processes should never be allowed to become a game of skill between contending counsel. There has been entirely too much of this in the past. It has resulted in the miscarriage of justice in many cases and has bred a spirit of disgust for law and contempt for courts in the public mind.
Reduced to its last analysis the doctrine contended for by *Page 703 
counsel, if recognized, would require this court to hold that where evidence is admitted during a trial, and upon appeal it is held that such evidence was improperly admitted, a reversal of the conviction must follow, regardless of the character of the evidence in the record, upon the ground that the prosecution, having offered this evidence as a part of its case, it is stopped from denying its injurious effect. It appears to us that this application of the doctrine of estoppel, to the state, in the enforcement of its criminal law, on account of the ignorance or mistaken judgment of one of its servants, is technically run mad and gone to seed. We decline to be bound by or to follow a line of authorities so repugnant to reason, so demoralizing to respect for law and so destructive to justice. The habit or reversing cases upon technicalities is a very convenient one for appellate courts, for by so doing they can escape much hard labor and all responsibility for their decisions, for a violation of some technical rule can be found in almost every closely contested case. We believe that appellate courts should faithfully and fearlessly do their duty and decide every question presented, with reference to the substantial merits of the case in which it arises. In this way only can justice be administered.
Ignoring justice and deciding cause upon technicalities has not only largely lost to the courts the confidence and respect of the people, but it has also greatly alarmed the profession of law itself. No one can say that the members of the American Bar Association are sensationalists or are wanting in learning or ability. It is eminently a conservative body. Yet we find them crying out against and proposing a remedy for this evil. At its last meeting at Seattle, Washington, it recommended to Congress the following amendment to the Revised Statutes of the United States:
"No judgment shall be set aside, or new trial granted, by any court of the United States, in any case civil or criminal, on the ground of misdirection of the jury or the improper admission or rejection of evidence, or for error as to any matter of pleading *Page 704 
or procedure, unless in the opinion of the court to which application is made, after an examination of the entire case, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice. __ U.S. Comp. Stat. 715.
"No writ of error shall be issued in any criminal sase unless a justice of the Supreme Court shall certify that there is probable cause to believe that the defendant was unjustly convicted." __ U.S. Comp. Stat. 575. (See Green Bag, October, 1908, page 525.)
The same recommendation was adopted by the New York State Bar Association at Buffalo, on January 28th, and 29th, 1909. (See Green Bag for February, 1909.)
While the above resolutions are in stronger language than our statutes upon the same subject, yet they are protests against the same evil, breathe the same spirit and tend in the same direction. While we do not recognize the action of the American Bar Association and of the New York Bar Association as authority, yet we are pleased to know that views which this court has repeatedly expressed in written opinions have found such impartial, able, and conservative indorsements.
Section 5618, Wilson's Rev. Ann. Stat. 1903, is as follows:
"Sec. 5618 (482). On an appeal the court must give judgment without regard to technical errors or defects, or the exceptions which do not affect the substantial rights of the parties."
It is the fixed purpose of this court to carry out the spirit of this statute, and when a defendant has been properly charged with an offense and fairly tried and the evidence clearly establishes his guilt, this court will not reverse the conviction upon any technicality or exception which did not deprive the defendant of a substantial right. We cannot perform this duty without examining the entire record and going over the entire case. It is true that in the first instance the jury constitutes the triers of the case, but when a defendant by appeal brings a case to this court and thereby invokes our judgment, we cannot act intelligently upon his appeal and determine the application of the legal *Page 705 
principle involved to the facts in the case unless we carefully consider the evidence and weigh it just as an intelligent jury should do upon the trial. If we cannot do this, then this court is a miserable and contemptible farce.
There is no more technical court on earth than the Court of Criminal Appeals of Texas. During the earlier days of its existence it did sustain the doctrine for which counsel for defendant contend. Upon reason alone that court now substantially sustains our position in Jinks v. State, 33 S.W. 868. Jinks was convicted of murder in the first degree. Certain evidence was admitted which the court held was incompetent. Judge Davidson, in rendering the opinion of the court, said:
"But concede its inadmissibility; should the judgment be reversed? The answer to this question depends upon the nature of the case; that is, the probable effect that it could have had upon the jury, viewed in the light of all the testimony in the case. `Where evidence of an important fact, material and pertinent to the issue, though additional to other facts legally in evidence, is erroneously admitted, the conviction should be set aside.' But, while this is the rule, reason would suggest an exception thereto. If the incompetent evidence could not have affected the case, there would be no reason in reversing the judgment on account of its admission. . . . Applying this exception, the facts of this case leave not a shadow of a doubt regarding the guilt of the defendant of the offense for which he has been convicted, with the testimony of Miss Maggie May eliminated. That appellant shot and killed the deceased cannot be questioned; that he shot him under circumstances which establish a homicide upon express malice is also evident, if murder upon express malice can be established by the positive proof of a number of witnesses. There is not a break in the testimony that is worthy of consideration, it all tending in the same direction, with the absolute certainty that appellant, with express malice, killed the deceased. No juror, with the least regard to his oath and the testimony in the case, could possibly have any sort of doubt as to the guilt of the appellant of murder in the first degree. This inadmissible testimony could not have had a feather's weight in inducing the jury to believe any fact which was necessary to make a case of murder upon express *Page 706 
malice. Again, it could not have prejudiced the appellant, because the jury gave him the lighter punishment. Under such a state of facts, while the testimony of Miss Maggie May may not have been admissible, we do not believe that the judgment should be reversed because of its admission by the court. We have given the record a careful examination, and find no reversible error."
It is worthy of remark that that illustrious jurist, Judge James M. Hurt, who has been most justly praised by counsel for defendant in their brief, participated in the consideration of this case and concurred in the conclusions reached.
John B. Shaw was found guilty of murder and sentenced to be hung. He appealed his case to the Court of Criminal Appeals of Texas. Upon the hearing the court held that the trial court had erred in permitting incompetent evidence to be admitted against the defendant, but, notwithstanding this fact, the conviction was affirmed and Shaw was executed. The case will be found in the 39 Texas Criminal Reports, 161. Judge Hurt rendered the opinion of the court. In giving the reasons why the conviction should be affirmed, he said:
"We have carefully examined the record, and it establishes the guilt of the defendant beyond any question. Lee Wilson, the accomplice, testified positively and directly to the facts attending the killing, and even if we eliminate his testimony, and consider the case solely upon the circumstantial evidence, the guilt of the defendant is established with that degree of certainty required by the rules regulating that character of testimony. The circumstances inherently leave no hypothesis consistent with appellant's innocence, but show conclusively and to a moral certainty that appellant, with his companion Lee Wilson, and no other persons, committed the murder. The record before us shows most astrocious murder, rarely equaled in the annals of any country. The only motive assigned is that appellant coveted the wife of Crane, the deceased. He was the manager of Pierce's ranch; and the deceased, his wife, and three small children were living on the premises, the appellant boarding with them. According to his own account, he was having a liaison with Mrs. Crane, but, not content with this, sought to have her entirely to himself by putting her husband out of the way. *Page 707 
We gather from the testimony that he had been brooding over the matter for some time, for evidently Lee Wilson came to the ranch, stayed all night on the 1st of November, to be in readiness on the morning of the 2d, in pursuance of a conspiracy. Wilson went to the woods, and stationed himself, while appellant hied to the field, where the deceased was engaged in picking cotton, and there decoyed or forced him to mount his horse, and accompany him to the point where Wilson was waiting. There these parties, armed, forced the defendant to go into the thickly wooded pasture (as significant of its character, it is called `Jungle Pasture'); and thence the testimony shows that they forced him along the canyon, and to a remote and thickened portion of the same. Enroute, appellant cursed and abused him, and told him that he intended to kill him. Twice the deceased attempted to escape, but they pursued and overtook him. Appellant shot him in the back. He fell from his horse. The parties got down and put him on his horse again and, when he had proceeded into a dense thicket, appellant again shot him twice with his winchester. Not content with this, after he had fallen upon the ground, he broke his skull in five or six places with his gun. The parties then separated, Wilson taking a circuitous route back to Cleburne, and appellant returning to the home of the deceased, and then cooly sitting down with the family, and eating dinner. As stated above, few cases equal this in horror, and none surpass it. King David, when he sacrificed Uriah, in order to possess himself a wife, placed him in front of the battle. He was armed, and had some chance for his life; and if he fell, he would at least perish honorably, in defense of his country. But here, instigated by the same character of motive, appellant gave his victim no opportunity whatever. He forced or decoyed him from his labor in the field into the jungle, there not to engage in equal combat, but re-enforced by another, with gun or pistol, set upon and shot him to death, unarmed and helpless, and while fleeing for his life. In our opinion no punishment can be too severe for one who, after having claimed to have debauched the wife, decoys her husband into a jungle, and murders him in the brutal and cowardly manner disclosed in this record. The jury simply did their duty in visiting upon him the highest penalty of the law. We find no error in the record requiring a reversal of the judgment, and it is accordingly affirmed."
Whatever Judge Hurt's views may have been in his younger *Page 708 
days, upon the question of harmless error, the cases of Jinks v.The State, 33 S.W. 868, and of Shaw v. The State, 39 Tex.Crim. Rep. 151, present his mature views, after having spent many years upon the bench and seeing how often justice had been defeated and the guilty had escaped punishment through the mysticism of technicalities.
The conclusions announced in the cases of Jinks and Shaw are not based upon any statute and no authorities are cited in support of them. They are founded alone upon the eternal principles of truth and justice, and as such we give them our hearty approval.
The enforcement of the doctrine of harmless error in Oklahoma will greatly improve the character of our criminal trials. Lawyers will be compelled to try their cases upon their actual merits, and will cease devoting so much time in attempting to force technical errors into the record. The needless waste of much valuable time and the expenditure of a great deal of money will be saved, and far better results will be reached in the administration of justice, and the courts will gain the confidence and respect of the people, and acts of mob violence will cease to disgrace our state.
The reversal of the just convictions of the guilty, upon purely technical questions, is the prime cause of want of confidence in the courts. This want of confidence often results in mob violence on the part of a long-suffering and outraged public. We have the highest possible authority for this statement, for we are told in the Bible that:
"Because sentence against an evil work is not executed speedily, therefore the heart of the sons of men is fully set in them to do evil." (Ecclesiastes, 8-11.)
In a public address delivered at Ithca, New York, Hon. Andrew D. White makes this startling but truthful statement:
"While the number of murders is rapidly increasing, the procedure against them is becoming more and more ineffective, and, in the light of recent cases in New York and elsewhere, is seen to be a farce. *Page 709 
"One of the worst results of these causes is the growing opinion among the people at large that men with money can so delay justice by every sort of chicanery that there is a virtual immunity from punishment for the highest crimes."
In a paper presented at the thirty-second annual meeting of the New York State Bar Association, held at Buffalo, January 28th and 29th, Hon. E.P. Wheeler truly says:
"It seems to have been forgotten that society has an interest in the punishment of criminals. All authorities on criminology agree that the certainty of punishment is far more important in the prevention of crime than its severity. The present system tends to make the punishment of crime as uncertain as human laws can make it. The old maxim is forgotten: Judex damatur cum nocensabsolvitur.
"A favorite devise of the gentlemen who achieve success in the manumission of murderers and the protection of the criminal classes is to apply to a federal judge for a writ of habeascorpus. He finds there is no cause for its issue and orders the prisoner remanded. Then an appeal is taken to the Supreme Court and the execution of a just sentence is stayed, while hysterical appeals are being made for pardon. On the other hand, we see the populace, enraged by the delays of justice, engaged in equally hysterical lynching. The innocent suffer. The guilty escape. And we call this civilization."
The original opinion in this case affirming the conviction of the defendant was not based upon the approval by this court of the rulings of the trial court with reference to the admission of the alleged expert testimony, but on the contrary the case was affirmed alone upon the ground that the evidence against the defendant was so overwhelming and conclusive that there could be no other rational deduction drawn therefrom except that the defendant was guilty, and that the evidence objected to was harmless error. An impartial and intelligent jury could not be found who, with a due regard for the unobjectionable testimony in this case and their oaths, could come to any other conclusion than that the defendant unlawfully took the life of the deceased. The evidence all tends in the same direction and, with as near approach to certainty as human testimony can attain, shows that the defendant *Page 710 
is guilty. The case could not be made stronger against the defendant than it is made by the testimony which is perfectly competent. Strike out the incompetent evidence and the state's case would not be in any manner weakened. The guilt of the defendant was the only rational conclusion at which the jury could arrive, with the evidence of Drs. Miller and Voyles stricken out. Therefore their evidence could not have affected the case and its admission was harmless error.
The idea that the deceased may have inflicted the wounds upon herself, which caused her death, in the light of the physical facts in this case, is just as unreasonable as the statement of the Roman soldiers that while they slept the disciples came and stole the body of Christ. How could they tell what happened while they slept? How could a 200 pound woman reach around her body and, with a pistol held so far from her that her clothes were not badly scorched, shoot herself under and behind her left arm, and the bullet come out at her left nipple? One statement is just as unbelievable as the other.
We realize that a great responsibility rests upon this court and that we have a sworn duty to perform, and we feel that it would be a crime against society to reverse this conviction, in the light of the entire record in this case. If we thought that the alleged expert evidence in this case could have had any influence upon the jury in convicting the defendant, we would seriously consider the question of granting a new trial. But we could not entertain such an opinion without reflecting upon the intelligence or integrity of the jury. There is nothing in this record which suggests a doubt upon this question. In the face of the entire record we have failed to find any error which would justify us in setting aside the verdict and the judgment of the court rendered thereon. Having arrived at this conclusion after a most painstaking re-investigation of the entire record, our duty is plain.
This court is largely responsible for the property, the liberty, and lives of the people of Oklahoma. Next to honor, human life *Page 711 
is the most sacred thing on earth. He who needlessly takes it must be held to a strict responsibility for such action. Laws are made to be enforced. Punishments are prescribed to be inflicted. If men do not respect the law they must at least be made to fear it, and to know that while justice may move with a leaden tread, it crushes with an iron heel.
It is true that the conduct of the deceased is not above criticism. That she conducted herself in a very unwifely manner is conclusively shown from the testimony in this case. But while she gave great offense to her husband, most grievously was she made to suffer for it. If he could not live with her in peace, why did he not separate from her? Her conduct gave him ample justification for so doing. But we are now dealing alone with the question of the guilt of the defendant. There is nothing in the record which justified him in constituting himself sheriff, judge and jury, and to arrest, try, condemn, and execute her without even giving her the opportunity to say, "God have mercy on my soul."
The defendant is the author of his own misfortune. Giving vent to his unlawful and wicked passions has brought him to the position which now confronts him. He has no one except himself to blame for the condition in which he finds himself. We have discussed this question at length, because our criminal jurisprudence is now in its formation period, and we desire the bench and bar to understand fully the reasons and the grounds upon which we base our determination. When a defendant has been properly charged with an offense and fairly tried and convicted, and the evidence sustains the conviction, we will not reverse the case upon any technicality or exception which did not work an injustice to the defendant.
Rehearing denied. *Page 712