## LOWRY WHITE v. STATE.

No. A-219.    Opinion Filed November 21, 1910.

1. INDICTMENT—Murder—Sufficiency—Time for Objections. (a) All objections as to the sufficiency of an indictment should be presented by proper motions before the defendant pleads thereto. When the defendant enters his plea of not guilty and waits until after the jury has been empaneled and sworn and then for the first time questions the sufficiency of the indictment by objecting to the introduction of testimony, on the ground of such insufficiency, the objection should be overruled, if by any reasonable construction or intendment the indictment can be sustained.

(b) For an indictment for murder held to be good as against the objection after the jury had been sworn that it did not allege facts sufficient to constitute an offense, see opinion.

2. WITNESSES—Impeachment — Harmless Error. (a) For the purpose of impeaching a witness he may be asked on cross-examination if he has ever been convicted of a felony or of any crime which involves a want of moral character, but it is improper to ask him if he has ever been indicted, arrested or imprisoned, before conviction for any character of offense.

(b) Although a witness may have been improperly impeached, yet such error will not be ground for reversal when the witness has not testified to any fact favorable to the defendant, upon the ground that the reception of incompetent evidence, which it appears was not prejudicial to the defendant, is not ground for reversal.

3. EVIDENCE—Threats—Admissibility—Trial—Record of Excluded Testimony. (a) When threats are admissible in evidence the fact that they were communicated to the defendant may be testified to by the defendant or any other person who heard them so communicated, and it is not necessary for the defendant to prove that as a matter of fact such threats were actually made.

(b)   When objections to a question are sustained, if it is desired to reserve the question as to the competency of the testimony sought to be introduced, for the determination of this court, the record must contain some showing as to what the testimony of the witness would have been had he been permitted to answer the question. Otherwise this court cannot determine as to whether the defendant has been injured by the ruling of the trial court.

(c)   When counsel desire to incorporate in the record what they expect to prove by a witness, if he had been permitted to answer a question to which objection had been sustained, it is improper for counsel to make an oral statement in the presence of the jury as to what they expect the testimony to be; they should reduce the statement of such testimony to writing and hand it to the trial judge, and if he is in doubt as to its admissibility, the jury should be withdrawn and the court should hear what the actual testimony of the witness would be, and this should appear in the record.

(d)   Threats made by the deceased against a defendant are not admissible in evidence when there is no testimony presenting the issue of self-defense.

4.   INSTRUCTIONS—Sufficiency. Although the instructions of the court may be subject to criticism, yet if when taken as a whole they are substantially correct, and present the law as favorably for the defendant as he could claim, the judgment will be affirmed as far as the instructions are concerned.

(Syllabus by the Court.)

*Appeal from District Court, Alfalfa County; M. C. Garber, Judge.*

Defendant was convicted of the crime of manslaughter in the first degree and sentenced to thirty years' confinement in the penitentiary, and he appeals.

May White was convicted of the crime of manslaughter in the second degree and sentenced to two years' confinement in the penitentiary, but her case is not before this court.

*O. D. Hubbell,* for plaintiff in error.
*Smith C. Matson,* Asst. Atty. Gen., for the State.

FURMAN, PRESIDING JUDGE.   1.   Upon the trial of this cause counsel for the defendant objected to the introduction of any testimony upon the following ground:

"That the indictment does not allege that the homicidal act itself was done feloniously or without authority of law and with the

premeditated design to effect the death of the deceased—that the mortal wound was so inflicted."

The charging part of the indictment in this case is as follows:

"That in said county of Garfield, in said state of Oklahoma on the 3rd day of March in the year of our Lord one thousand nine hundred and eight, Lowry White and May White persons then and there being, did then and there unlawfully, wilfully, feloniously, without authority of law, and with the premeditated design to effect the death of one Fred Haunstein, shoot off and discharge leaden bullets into the body of him, the said Fred Haunstein, from a certain loaded shot gun then and there handed to the said Lowry White by the said May White, and which he, the said Lowry White, then and there had and held in his hand; then and there and thereby inflicting upon the body of him, the said Fred Haunstein, a mortal wound, of which wound he, the said Fred Haunstein, then and there on the 3rd day of March, 1908, did die.

"And so the grand jurors aforesaid, upon their oaths aforesaid, do say and find that the said Lowry White and May White, in manner and form aforesaid, did kill and murder the said Fred Haunstein.

"Contrary to the form of the statute, in such case made and provided and against the peace and dignity of the State of Oklahoma."

It will be observed that the indictment charges that Lowry White and May White, unlawfully, wilfully, feloniously, without authority of law and with the premeditated design to effect the death of one Fred Haunstein, did shoot off and discharge leaden bullets into the body of him, the said Fred Haunstein, from a certain loaded shot gun which he the said Lowry White then and there held with his hand, and thereby inflicted upon the body of him, the said Fred Haunstein a mortal wound from which wound he, the said Fred Haunstein on the 3rd day of March, 1908, did die, and so the grand jurors aforesaid upon their oaths aforesaid do say and find that the said Lowry White and May White in manner and form aforesaid did kill and murder the said Fred Haunstein. In our judgment it clearly charges that the homicidal act itself was feloniously committed without authority of law and

4 Cr.—10

with a premeditated design to effect the death of deceased, and that the mortal wound was so inflicted.

Our statute provides that all persons who are concerned in the commission of an offense are principals. The indictment charges joint intent and action on the part of both of the defendants. It was therefore immaterial as to which one fired the fatal shot. The allegation in the indictment that the gun was then and there handed to said Lowry White by the said May White was altogether unnecessary and may be treated as surplusage, but be that as it may, the said May White not being now before this court, this allegation could not in any manner injuriously affect the defendant Lowry White.

In the case of *Blair v. State,* decided at this sitting of the court, *infra,* Judge Richardson, speaking for the court, said:

"It is next urged that the information was defective, for the reason that it did not allege that the killing itself was committed by the defendant with a premeditated design to effect the death of the deceased, citing *Holt v. Territory,* 4 Okla. 76, 43 Pac. 1083. The information charges, however, that the act of shooting which resulted in death was committed by the defendant with a premeditated design to kill, and that was sufficient. The defendant did nothing further. Death resulted from the physical effect upon the deceased of the shot thus fired, and not from any further act of the defendant; and the shooting resulting in death, constituted the killing. *Holt v. Territory, supra,* does not sustain the defendant's contention, and would not be a correct statement of the law if it did."

Motions of this kind coming after the jury had been empaneled are not looked upon with favor. If the indictment was defective this matter should have been called to the attention of the trial court by proper motions before the defendant entered his plea. This is the reason why the defendant is allowed by statute one day in which to plead. If the defendant enters his plea and waits until the introduction of the evidence to object to the sufficiency of the indictment, the objection should be overruled if by any possible construction or intendment the indictment can be sustained. We are therefore of the opinion that the court did not err in holding the indictment in this case to be good.

2. Upon the trial of this cause, the defendant being upon the witness stand on cross-examination, the record discloses the following questions propounded to him and answers thereto:

"Q. Lowry, were you ever tried on a complaint by your foster-father, Columbus White, your adopted father, in the probate court of Garfield County, Oklahoma, at Enid, on a charge of threatening to do him bodily harm and upon that trial, placed under a peace bond to keep the peace toward him and found guilty of the charge? By Mr. O. D. Hubbell, of counsel for the defendants, and each of them, herein: The defendants, and each of them, object to that question for the reason that it is incompetent, irrelevant and immaterial, and it is objected to for the further reason that it is not proper cross-examination of this witness. By the Court: The objection is overruled. By Mr. O. D. Hubbell, of counsel for the defendants, and each of them, herein: To which ruling of the court, overruling said objection, the defendants, and each of them, at the time except. A. I was brought up before—— Q. Now, wait. Answer the question that has been asked you, Lowry. By Mr. O. D. Hubbell, of counsel for the defendants, and each of them herein: Let him answer that question in his own way. Q. Answer it in your own way. I am willing for you to do that. A. What was the question now? Q. Were you ever tried on a complaint by your step-father, Columbus White, your adopted father, in the probate court of Garfield County, Oklahoma, at Enid on a charge of threatening to do him bodily harm and upon that trial, placed under a peace bond to keep the peace toward him and found guilty of the charge? A. I never was put in jail or anything like that. Q. I will ask you, Lowry, if at that time, you did not give a peace bond? A. Yes, sir; I was brought up before Judge Garber several years ago. Q. When he was the probate judge of Garfield County, Oklahoma, was it? A. When he was probate judge and my folks were there and told how it was and the judge gave the old man quite a talking to. Q. I am not asking you now what was said. You were placed under a one thousand dollars ($1,000.00) bond, was you not? A. Well, yes, I guess it was the bond. I signed it. Q. That is correct, is it not? A. Yes, sir; I think so. Q. I will ask you if while that bond you gave, of yours, was still in existence and soon thereafter, you did not have another altercation with your father and beat him? A. No, sir; I think not."

And the record further discloses that the following questions were propounded to the defendant and answers thereto made:

"Q. Now, Lowry, before the time that you were arrested in the month of November—before you were arrested on Thanksgiving Day, that you have testified about, how many times up to that date had you been in jail in the city of Enid? By Mr. O. D. Hubbell, of counsel for the defendants, and each of them, herein: The defendants, and each of them, object to that question for the reason that it is incompetent, irrelevant and immaterial and for the further reason that it is improper cross-examination. By the Court: The objection is overruled. Q. Up to that time, Thanksgiving Day? Before the time you were arrested on Thanksgiving Day that you have testified about, how many times up to that date had you been in jail at the city of Enid? By Mr. O. D. Hubbell, of counsel for the defendants, and each of them, herein: Now, if the court please, the defendants, and each of them, renew their objection to the question just asked by the prosecuting attorney for the reason that it is incompetent, irrelevant and immaterial and for the further reason that it is improper cross-examination of this witness. By the Court: The objection is overruled. By Mr. O. D. Hubbell, of counsel for the defendants, and each of them, herein: To which ruling of the Court, overruling said objection made by the defendants, and each of them to the question just asked by the county attorney, the defendants, and each of them, except. Q. Answer the question. A. Before, you say? Q. Before the time you were arrested on Thanksgiving Day, as you have testified about, how many times up to that date, had you been in jail in the city of Enid, Oklahoma? A. Well, I had been in once. Q. Once? A. Yes, I had been in jail once overnight. Q. You had been in jail just once before the time that you were arrested on Thanksgiving Day? A. Yes, sir; just once. Q. You was not in twice? A. No, sir; I was not. Q. Before that? A. No, sir; I was not."

Defendant was also questioned with reference to some alleged trouble between his wife and himself. We do not think that any of this evidence was admissible for any purpose and are of the opinion that the objection thereto should have been sustained by the trial court. It may be regarded as the settled law in Oklahoma that a witness cannot be impeached by asking him as to whether he has ever been indicted, arrested, or imprisoned before conviction, for any offense whatever, but he may be asked on cross-examination, for the purpose of impeachment, if he has been convicted of a felony, or of any crime which involves a want of moral

character. For a full discussion of this question see *Slater v. United States,* 1 Okla. Cr. 283. The court, therefore, did err in not sustaining the objections urged by counsel for the defense to the questions propounded by the county attorney, and the answers of the witness thereto.

In what attitude, then, does the admission of this incompetent evidence place this case? Does it follow that the conviction must necessarily be reversed because of the error of the trial court in admitting this illegal and incompetent evidence? Certainly not. The Supreme Court of Colorado, in the case of *McQueary v. The People,* 100 Pac. 212, correctly states the rule in such cases as follows:

"The reception of incompetent and immaterial testimony, which it appears was not prejudicial to the party objecting thereto, is not reversible error."

For a full discussion of this question see *Byers v. Territory,* 1 Okla. Cr. 698.

We must therefore look to the entire record and see if the defendant was in any manner injured by the introduction of this testimony. If the defendant's testimony had presented any issue upon which a verdict of not guilty could have been rendered, then this testimony might have injured him, because it might have caused the jury to question the truthfulness of his statements. We find upon examining the record that the defendant's version of the fatal difficulty is that the deceased was driving by the house of the defendant on the public road in a buggy. The defendant then proceeded to testify as follows:

"A. Haunstein passed the corner of my house and was looking right at me. I stopped and returned the look and he hollered at me. He says: 'Go to hell, God damn you,' just that way. Q. Well, go ahead and tell what was said. A. I hollered back. Q. Do you remember what it was you said to him, Lowry? A. Yes, sir; I do. Q. Well, what was it that you said? A. I hollered back: 'If you want anybody to go to hell, go to hell yourself.' Q. Go ahead? A. Well, he checked his horse up—reigned his horse up and says: 'If you will come out here, I will beat hell out of you, or 'whip hell out of you' or something like that, and I said: 'I don't know whether you could or not.' He says: 'You couldn't

whip nobody but your wife' and drove out toward his fence and
hollered for John Roads. Q. How was that? A. He hollered for
John Roads. Q. What did you say or do there? A. I did not say
or do anything, only I had walked on out there and was standing
close by my mail box and he stood up in the buggy and hollered,
'O, John,' and waived his— I think he had on a— cap, hat, or
whatever it was like that. I was still standing there and he turned
around and saw May standing at the corner of our kitchen, or I
suppose a little west of the corner, at the south side of the kitchen
and he says:• 'I am not going to fight you here where you can have
that God damned "chippie" for a witness.' Q. Well, go ahead and
tell just what took place. A .He drove down the road rather close
to his pasture fence and, after he had gone down the road some
distance, he turned out to the fence again and tied his horse—got
out of the buggy and tied the horse to his pasture fence. Q. He
got out of the buggy, did he? A. Yes, sir; he did. Q. And then
after he had gotten out of the buggy, you say that he tied his
horse? A. Yes, sir. Q. Well, what was said then? A. He said:
'Come on down here, God damn you, if you are not a coward' and
I says: 'God damn you, I am not no coward but I am not going
down to your house to fight.' I says: 'I will meet you half way'
and walked down the road almost half way between his buggy and
where I had been standing by the mail box. Q. You mean half
way to the buggy or half way to his house? A. Half way to where
he was. Q. What did he say or do? A. He rolled up his sleeves.
He says: 'God damn you, if you will not come after me, I will
come after you,' and he come up to where I was at, and when I
seen him coming, I stooped by the side of my fence, right at the
corner of the orchard and picked up a board. When he come on,
I says: 'Listen here, you are a better man than I am. I am not
going to fight you bare-handed' and I says: 'If you don't stay off,
I am going to hit you with this board,' and he made a motion and
I struck at him and he knocked the lick off and took the board in
his own hands and hit me on the nose and then the board was
dropped to the ground and he caught hold of me around the neck
with one arm and I caught him by the leg but he threw me down
and I got loose and then I hollered for May to bring the gun.
She run in the house and got the gun and run out there. In the
meantime I was going a little bit toward my house or back east
along the road and, before she got out there, we clinched again and
he got me down and choked me and had one hand on my throat
and I don't know where his other hand was but he had me down

and was straddle of men and Mrs. Haunstein was coming across the pasture and John Roads rode up and he looked around at John and I remember going out backwards between his legs and getting loose. Q. You got loose from him, did you? A. Yes, sir; I got loose from him. Q. And then what occurred? A. I run to where May was. Q. You run over to where your wife was? A. Yes, sir; I run over there. Q. How far was that? A. When I got up the street to where she was about a little bit farther than from here to Mr. Whittinghill, I should judge—I could not say definitely. Q. Where was Mr. Haunstein then? What was he doing? A. He spit on his hand and cracked his fist like that (indicating) and came toward me. Q. What did he say? A. I don't remember. Q. You say that you don't remember what he did say, do you? A. No, sir; I don't remember as to that. Q. Well, he came toward you? A. Yes, sir. Q. What was done then? What motion, if any, did he go through with or yourself? Tell the jury just what was done? A. Well, he spat on hands and cracked his fists and came toward me fast. Q. Were you going toward your wife at that time? A. Yes, sir; I was. Q. You say that you was going in the direction where your wife was? A. Yes, sir. Q. When did you get the gun? A. When he was coming toward me, then. Q. And what was done then? What did you do with the gun? A. I took the gun and cocked the right hand barrel and held it in my hand and discharged it over his head. Q. What did he do? A. He ducked like this (indicating) and come close to me and he was as close to me as from here to Mr. Whittinghill (indicating a distance of where the witness was standing and where Mr. W. A. Whittinghill, his counsel, was sitting or about 8 feet) and he went down like that (indicating) when I shot over his head and he still came toward me and I cocked the left hand barrel and took the gun level with his body. Q. What position did he assume? A. Just then he turned with the left hand side toward me and I shot the left hand barrel."

The defendant did not request any instructions as to his right to defend himself if he had voluntarily engaged in a mortal combat with the deceased and afterwards attempted to withdraw from said combat before the fatal shot was fired. In the light of the entire evidence in the case, we do not believe that any fair and impartial jury could have been found who would have entertained a doubt as to the intention of the defendant to abandon the conflict when he says he ran towards his wife. The evidence clearly

shows that he ran to his wife for the purpose of getting the gun and killing the deceased. John Roads, a witness for the state, testified as follows:

"Q. Where was you when you first saw Lowry White? A. Well, I just come out— come around to look around the corner of the school house to see who Fred was calling. Q. At that time you saw Haunstein tying his horse? A. Yes, sir; I did. Q. Now, with reference to where Haunstein was tying his horse, where was White? A. He was east of him. Q. How far? A. About seventy-five (75) or one hundred (100) steps. Q. With reference to the front of White's house, where you come out to the road, where was White? A. He was a little west. Q. What was White doing the first you saw him? A. Going down the road toward Haunstein. Q. Did he say anything at that time? A. I don't know. Q. You did not hear anything? A. No, sir. Q. Now, what did you next do? A. Well, I went on over there. Q. Now, coming over, did you watch them? A. Yes, sir. Q. How much of the time on your way over there could you see them? A. Well, nearly all the time. Q. What obstructed your view the rest of the time? A. There was a couple of draws that I had to go through. Q. Now, after you saw Haunstein tie his horse and Lowry White in the road proceed toward him, what did you next see between the two? A. I saw Lowry go out to his fence or pretty close to the fence and pick up a board. Q. What did he do then? A. He went toward Haunstein. Q. Did you hear him saying anything at that time? A. No, sir. Q. What did Haunstein do? A. He was standing in the road. Q. How far from his horse and buggy? A. Why, now, I hardly know; about ten (10) or fifteen (15) steps, I suppose. Q. East? A. Yes, sir. Q. Now, what did White do after he obtained this board? A. He went to Haunstein. Q. What did he do then? A. He drawed back the board and struck at Haunstein. Q. I will hand you a board, Mr. Roads, and ask you if this is the board that Lowry White had, do you know? (Here counsel hands a board to the witness.) A. That looks like the board. Q. What did White do with that board when you first saw him after he picked it up? A. Well, he went toward Haunstein with it and then I went into the hollow and I could not see neither one of them, but I saw the board go over. Q. Well, what do you mean by 'going over'? A. Just when he struck. I saw him come up to Haunstein and draw back like that, just as I went into the hollow and Haunstein

was kind of moving like he was getting ready to dodge and then as I went down into the hollow, the board went over, but I could not see whether it hit anybody or not. Q. When you come out of the hollow, what did you do, then? A. I saw Fred on top of Lowry, holding him down in the road. Q. Did you hear any conversation at that time? When you come out of the hollow, could you hear them saying anything? A. No, sir; I could not. Q. What did they next do? A. Well, I heard a conversation between May White and Fred Haunstein. By Mr. Whittinghill, of counsel for defendants: That answer is objected to for the reason that it is not responsive to the question. By the Court: The objection is sustained. Q. Did you hear any conversation between any of them there, May White, Fred Haunstein or Lowry White, at that time you say Haunstein had White down? A. Yes, sir. Q. Now, what was that conversation? A. May White says: 'I will shoot you if you don't let Lowry up.' Q. Where did you first see May White? A. I saw her north of the house a little ways. Q. Where was you when you saw her? A. I was right even with the school house quite a ways east of Haunstein and White. Q. That was after you had gotten on your horse to start over there? A. Yes, sir. Q. What did she do after you first saw her? A. She went toward the house and went into the corner of the house— I don't know whether she went into the house or whether she went into the other house in a kind of a 'T' or 'L' shape and she went in first and come out with two guns. Q. What kind? A. Shot gun and revolver. Q. Where did she go? A. She went to where Haunstein and White were. Q. With reference to the time she came out of the house with these guns or at that time, what was Haunstein and White doing? A. Well, White was going toward Haunstein with a board and Haunstein was standing in the road. Q. What was this conversation and what was it White said to Haunstein? What was it Mrs. White said to Haunstein? A. She said: 'I will shoot you if you don't let Lowry up.' Q. What took place? A. Fred says: 'You better not' or 'I am not afraid of you' or something to that effect, but Fred let Lowry up. Then Lowry went back and got his board and he came up to Haunstein and struck at him the second time and Haunstein threw up his arm that time and I don't know just where the board hit him —shoulder or arm—but he pushed the board away and caught Lowry around the neck and Lowry had Fred I believe by the shirt collar. Q. Where were you when that happened? A. About even

with White's house. Q. You were still on your horse?· A. Yes,
sir. Q. Did you get off your horse that day while that alterca-
tion was going on. A. No, sir. Q. Were you in the road or inside
of the field? A. I was in the road. Q. Where did you go into
the road? A. Right at my field where I was drilling. Q. Back
near the school house? A. Yes, sir. Q. Well, what took place
next between them now, Mr. Roads? A. Well, they were talking
about— I don't remember much about their conversation. They
were quarreling, though. Q. Were they standing up then? A.
Yes, sir. Q. And White had hold of Haunstein's collar? A. Yes,
sir. Q. What was said between them there, if you can remember?
A. Well, Haunstein told White or White told Haunstein to turn
loose and Haunstein says: 'I will turn you loose if you will go
to the house and let me alone' and· Mrs. White told Haunstein
that she would hit him with the shot gun if he did not turn Lowry
loose and he says: 'I will turn Lowry loose if he will give in' and
he turned him loose and then started back—let him loose and
Lowry called him a 'bum-latin son-of-a-bitch.' Q. That was after
he let go of Haunstein's collar? A. Yes, sir; it was. Q. What did
Fred say then? A. Fred spat on his hands and did something like
that and made about two or three steps toward Lowry White and
Lowry White turned and started the other way. Then Fred turned
and started on toward his buggy and turned about half way around
and says: 'That shows how brave you are' and started on toward
his rig. Then White grabbed the shot gun and shot and then
he cocked the other barrel and shot again and· Haunstein took
about two (2) steps and says 'Oh' and fell down. Q. How much
time interposed between the two (2) shots that were fired? A.
Well, they was fired just about as quick as he could cock the other
barrel and shoot. Q. How far toward his buggy had Haunstein gone
from the place they had their trouble until he was shot A.
About 10 steps, I should think. Q. How far had Lowry White
gone toward his home? A. He had gone about 5, I believe, or
something like that. Q. Where had Mrs. White been all this time?
A. She had been standing there. Q. And what did she have in her
hand? A. She had a shot gun in her right hand·and a revolver
in her left hand. Q. And this was the shot gun that was used
in the shooting of Haunstein by White? A. Yes, sir. Q. Did you
have any conversation with· Haunstein when you rode up? A.
Why, he told me to come·on up there and when I got up there
he says: 'I don't want you to take any hand in this. I just want

you to watch it'; and then I told them that they both better quit it; that is all the conversation I had with them. Q. Now, after the shot was fired, what did Lowry White do? A. He turned toward me and said: 'Give me another shell, May,' and she says: 'I haven't got any more,' and so then they both turned and went toward the house. Q. Where did White go then? A. I don't know where he went right then."

Mrs. Fred Haunstein, the wife of the deceased testified as follows:

"A. When I got to them, Fred was standing on the north side of Lowry. When I first saw them, he was on the south side and as I come up to them, I heard Fred say: 'I am not going to stand here and let you beat me over the head with a board,' and as I stepped to the fence, I spoke to them. Q. What did you say to them? A. I says: 'Lowry White, that is just what you have been waiting for. We pass this way every day. We couldn't pass this section line but what you have been out here trying to cause trouble,' and he says: 'Well, he had me arrested.' Fred says: 'What did I do it for? Didn't she come over there and tell a lot of things?' He says: 'I have always been a friend to you and loaned you everything on my place.' Q. Who says that? A. Lowry White to Fred. By Mr. Whittinghill, of counsel for defendants: If the court please, we object to what this witness said to the parties for the reason that it is wholly incompetent. We did not object at first, but as to what this witness said to either of the parties we think is entirely incompetent. By Mr. McKeever: It is a part of the conversation among all that was there at the time. By Mr. Whittinghill. I do not desire to discuss it. It is on the ground that it is incompetent and as to what she said to these parties, either of them, does not throw any light on what the parties themselves were doing or should have done or ought to have done. By Mr. McKeever: It is explanatory of the whole proposition. It took place right there at the time. This conversation was with these defendants. By the Court: The objection is overruled. By Mr. Whittinghill: To which ruling of the court, the defendants, and each of them, except. Q. Just go ahead and finish that conversation, if you have not already, Mrs. Haunstein? A. He says: 'You had me arrested. You couldn't prove anything. It was all lies.' Shall I tell you what I said? Q. Yes, go ahead. A. I said: 'You wouldn't go on the witness stand.' Q. Who were you speaking to then? A. I was

speaking to Mrs. White. Q. Mrs. White is one of the defendants here? A. Yes, sir. Q. Now, Mrs. Haunstein, what other conversation took place there between any of the parties? A. Well, I pointed to Mrs. White and I said—Mrs. White come out there with the shot gun and the revolver in her hand and Fred said something to Lowry about making faces at him, but I can't remember. Lowry then had his hand on Fred's shoulder' on his neck or hold of his shirt collar and Fred said for him to take his hand off and stand back and told him twice and then he turned and started toward home. Q. Who turned? A. Fred turned. Q. So. Lowry released his hold? A. He released his hold and gritted his teeth and called him an ugly name and my husband in some way spat on his hands and put them together and turned and went to the buggy and Lowry took the shot gun and shot twice. Q. After Lowry's hand was released from his collar, where did White go then? A. He stepped back. Q. How far back did he step? A. Oh, probably two or three steps, I could not just say. Q. Where did Fred go? A. He started on toward his buggy and his home. Q. How far apart were they, Mrs. Haunstein, when the shooting occurred? A. Well, I think—I don't think that they were over ten (10) steps; I could not say as to the exact distance, though. Q. Where was Mrs. White standing at the time that Lowry released his hand from Fred's neck? A. She was standing to the east. Q. How far? A. Well, tolerably close. Q. Now, what did she do when Lowry started to step back a few steps? What did Mrs. White do? A. She stood there then. Q. Did she move any at all? By Mr. Whittinghill: If the Court pleases, that question is objected to for the reason that it is leading. By the Court: It is leading. By Mr. McKeever: The question is withdrawn. Q. Now, when did Lowry White get the gun in his possession with reference to the time he released his hand from Fred's neck? A. After he called him this name, my husband started to walk away. He walked probably four (4) or five (5) steps from him. Q. How close were you to the parties when this occurred? A. Well, I don't think that I was over six steps from Lowry White and his wife and I was closer to my·husband than them. Q. In what direction was Mr. Haunstein going when the shots were fired? A. He was going west, and a little south—in a southwesterly direction. Q. How many shots were fired? A. Two (2). Q. How far apart were they? A. Just as quick as they could be fired. Q. What did Mr. Haunstein do ·after the shots were fired? A. I think

that he took about two (2) steps and threw up his left hand and fell. Q. Now, Mrs. Haunstein, state, if you know, how long he lived after the shots were fired? A. Well, you could not tell that there was any life in him after he fell. He was warm. Otherwise there was no signs of life."

There was also a great deal of other evidence in the record showing threats made by defendant and deceased against each other, indicating a very bad state of feeling between them. Under the testimony of the defendant himself he was unquestionably guilty of at least manslaughter in the first degree under the law of mutual combat. See *Boutcher v. State, infra,* decided at this term. It is therefore immaterial as to whether or not he was improperly impeached. No honest and intelligent jury having a due regard for their oaths and the testimony could do otherwise than find him guilty at least of manslaughter in the first degree upon his own testimony. The mere commission of error in the admission of testimony is not enough to secure the reversal of a conviction. The defendant must show that there is at least some degree of probability that he was injured thereby. If probable injury had been shown in this case we would grant the defendant a new trial for the admission of this improper testimony, but we cannot see how the defendant could have been injured by its introduction, for there was no issue made by any testimony upon which he could have been lawfully acquitted.

3. May White, the wife of the defendant, when on the witness stand on cross-examination, was questioned with reference to a certain affidavit which she was alleged to have made, charging her husband with having made an assault upon her; and the affidavit was offered in evidence by the state, which affidavit is as follows:

"State of Oklahoma, Garfield County, ss:

"AFFIDAVIT.

"Mrs. May White, of lawful age, being first duly sworn on her oath, states that she is the lawful wife of one Lowry White, and resides eight miles southeast of Waukomis, in said county.

"That on or about the 21st day of November, 1907, and for

two or three days thereafter, the said Lowry White, abused and beat the affiant and pushing her out of the hay mow, getting her between the open door and the door jam in their house and closing the same on her with sufficient force to fracture or break one of her ribs and that thereafter said Lowry White took this affiant and tied her wrists together and laid her on a table in the house and took a knife and threatened to cut her open and that when he was thus tieing her hands then laid her on the table, he threatened to dissect this affiant and the affiant broke loose and run towards a neighbor's crying for help, believing that the said Lowry White would kill her or do her great personal injury.

"That said affiant is now sick and confined to her bed as a result of such treatment and has been since Monday, the 23rd day of November, 1907, and further since the above took place the affiant has passed something.

"MRS. MAY WHITE.

"Subscribed and sworn to in my presence and before me and in the presence of the subscribing witnesses, this 30th day of November, A. D. 1907.

"CHAS. MOORE, Notary Public.

"My Com. Expires June 22, 1911."

Counsel for the defendant strenuously objected to all of this and reserved exceptions to the action of the court in its admission as evidence. We think that this evidence was entirely foreign to any legitimate issue in the case, and that its introduction was clearly erroneous; but we are here confronted with the same condition that existed with reference to the impeachment of Lowry. White. May White on her direct examination had testified to substantially the same facts that were testified to by Lowry White. Upon her own evidence both she and her husband were clearly guilty of manslaughter at least. She did not testify to a single fact which would even tend to reduce the offense committed below this degree. If there had been no other witness on the stand except the two defendants, the jury could not have done otherwise than convict them both at least of manslaughter upon their own testimony. Therefore neither of them could have been injured by anything which might tend to impair or impeach their evidence. The jury arrived at the most favorable verdict to the defendants

they could have reached. We therefore hold that while this evidence is clearly illegal, it was harmless, and not ground for reversal.

In *George v. United States*, 1 Okla. Cr. 307, this court said:

"When a defendant is clearly proven to be guilty this court will not reverse a conviction upon any technicality or exception which does not affect the substantial rights of the defendant."

4. The defendant complains that he was not permitted to testify as to threats which had been communicated to him as having been made by the deceased. The record upon this question is as follows:

"Q. Now, Mr. White, just tell the jury what threats, if any, were communicated to you by any one and by whom. Threats that were said to have been made by Mr. Haunstein. What he would do with you? By Mr. McKeever: The state objects to that question for the reason that it is immaterial and for the further reason that no foundation has been laid for it and it is objected to for the further reason that it is hearsay. It could not be anything but hearsay and it is not connected with the deceased, in any way, except by hearsay evidence. By Mr. Hubbell: It may be proved in that way. It may be proved by the accused himself that the threats were communicated to him; it can then be proved by the person who communicated the threats, or the person who communicated the threats may not have heard the threats,—even the person who communicated the threats may have heard from some one else that the deceased made the threats or it may be that the threats were made by the deceased to the party who communicatd them and it is just as competent for certain purposes to show that they were made directly by the deceased to the accused and it is to show the animus of the deceased, how his state of mind was toward defendant and aid us in explaining about the difficulty on that particular date down there. By Mr. McKeever, county attorney: If the court please, if the threats were communicated to this defendant, this defendant can't testify to that. It might be in the matter of corroborating another witness but it could not be any more than a self-serving declaration of this defendant to make a statement of that kind. It would be hearsay evidence. The threats might have been communicated to Lowry White and yet never made by Haunstein. By the Court: I think I will sustain the objection to that at this time, Mr.

Hubbell. By Mr. Hubbell: To which ruling of the court, sustaining the objection, the defendants, and each of them, except."

We cannot agree with the trial court as to the ground upon which this evidence of communicated threats was excluded. When threats are admissible in evidence it is competent for the defendant or any other person who may have heard such threats communicated to the defendant to testify to that fact, and such evidence is not in any sense of the word hearsay. The fact that they were so communicated would be original evidence, for the issue would be as to the communication of the threats and not as to whether they were actually made. A defendant is always justifiable when he acts upon the facts as they reasonably appear to him at the time when those appearances, if true, would be sufficient in law to constitute a defense, and it is immaterial as to whether his information is true or false; provided he acts in good faith and upon reasonable information and appearances of danger. For a full discussion of this question see *Morris v. Territory*, 1 Okla. Cr. 617. There are, however, two reasons why this case should not be reversed on account of this ruling of the court. First. When the defendant attempts to prove threats made against him and objections to the questions asked the witness are sustained, it is the duty of counsel for the defendant to incorporate in the record a statement as to what he expects to prove by the witness if allowed to testify. This court would then be in a condition to determine as to whether or not such offered evidence was material and proper. To reverse a case simply because a witness was not permitted to answer a question when there is no showing in the record that such answer would have been favorable to the defendant is to trifle with the law. We have no means of knowing what the answers would have been, and therefore cannot see whether the defendant was deprived of material testimony. Suppose this cause was reversed because the trial court refused to permit the witness to answer the questions which were asked him and upon a second trial the court finds that the answers to such questions were not material, it is clear that the action of the court in reversing the cause would be unjust

to the state. It is a very easy matter when objections to questions are sustained for counsel for the defendant to write out what answers they expect to obtain from the witness and hand it to the trial court and have it incorporated in the record as a part of the case. We could then intelligently pass upon the question as to whether or not the defendant was injured by the refusal of the court to admit this testimony. The writer of this opinion remembers a case which was reversed on account of the failure of the trial court to allow a witness to answer certain questions as to what the deceased had said. Upon the second trial the same questions were propounded to the witness and he replied: "He didn't say nothing." Had this answer been incorporated in the first record the reversal and delay of a second trial would have been avoided. The better practice would be to have the jury retire and let the court hear what answers the witness would make. This should be incorporated in the record. Then the matter could be intelligently passed upon both in the trial court and in this court. Neither counsel for the state nor for a defendant should be permitted to make oral statements in the presence of the jury as to what evidence they desire to introduce in reply to questions which have been objected to. This is a very unfair and dangerous practice. Improper impressions may thereby be made upon the minds of the jurors which cannot be effaced. Second. In the light of the entire record before us we do not believe that anything said or done by the deceased previous to the fatal difficulty could have lawfully benefited the defendant upon his trial. Threats are only material where the issue of self-defense is presented by the testimony. Even if the deceased had threatened the defendant this would not justify him in engaging in a mutual combat with the deceased. Touching this matter in the case of *Skipper v. State,* 144 Ala. 100, the Supreme Court of Alabama said:

"The defendant having willingly engaged in the deadly combat could not invoke the doctrine of self-defense, and was not entitled to have evidence of threats made by the deceased against him introduced in evidence."

4 Cr.—11

Mr. Wigmore, after a very clear and exhaustive summary of authorities touching this subject, says:

"A necessary condition of relevancy is that the fact of killing is conceded, and is justified as done in self-defense, and that the virtual controversy is whether there was in truth any need for defense, i. e., whether the deceased was the aggressor." (Vol. 1, page 111, Wigmore on Evidence.)

While there are some authorities holding to the contrary, yet we deem this rule to be both reasonable and just; and it will be enforced by the courts of Oklahoma.

Self-defense is a defensive and not an aggressive right. It is based alone upon the ground of necessity, and this necessity must not arise from the persistent intentional fault of him who attempts to plead it. The trial court, therefore, did not commit reversible error in refusing to allow the questions to be answered. The judge who presided at the trial of this case in the district court is not now on trial in this court. Any mistakes which he may have made then will not be cause for reversal by this court unless they were jurisdictional or deprived the defendant of some substantial right. While the defendant did nominally attempt to make a defense, yet his own testimony really amounts to a plea of guilty. We do not believe that an impartial, intelligent and honest jury could be empaneled who, with a due regard for their oaths, under his own testimony, would or lawfully could find the defendant guilty of a less degree of offense than that of which he was convicted. How, therefore, could he have been injured by the errors which were committed by the trial judge? Law is a progressive science and should keep even step with the march of civilization and the development of human character. While we are not wanting in respect for the learning and wisdom of the past, we are also of the opinion that the world should be ruled by the living and not by the dead. We are therefore determined not to follow any technical rule of law which cannot stand the test of reason and justice, it matters not how many courts may have decided to the contrary. Our idea is that law is the perfection of reason and the embodiment of justice, and it is by this standard that we will test all questions,

of law submitted to our determination, unless such questions are arbitrarily settled by the Constitution or by statute. We have no power to amend or repeal constitutional or statutory provisions, although we may disapprove them. Arguments against such provisions must be addressed to the people or the Legislature. But a different rule governs our action with reference to the law as established by precedents. We will weigh such questions in the scales of reason and justice and decide them in the light of the moral atmosphere which surrounds the case in which they arise.

To reverse a conviction where a defendant is clearly guilty, upon a mere technical error of the trial court, which could not have injured the defendant, would be a prostitution of reason and an outrage upon justice and an act of treason to the law-abiding people of the state.

5. Counsel for the defendant complain of numerous errors alleged to have been committed by the trial court in its instructions to the jury. These instructions are not above criticism, but taken as a whole they are substantially correct and are as favorable to the accused as he could claim. It would therefore be a waste of time to discuss the instructions in detail. Taking this record as a whole we find no reversible error in it, and think that the defendant should congratulate himself upon the zeal and ability of his counsel, which alone saved him from a conviction of murder, with the possible infliction of the extreme penalty.

The judgment of the lower court is therefore affirmed, and is reformed to provide for the imprisonment of the defendant in the state penitentiary at McAlester, Oklahoma.

DOYLE, and RICHARDSON, JUDGES, concur.