## W. H. STOUSE *et al.* v. STATE.

No. A-542.   Opinion Filed December 11, 1911.

(119 Pac. 271.)

1.  CRIMINAL LAW—Service of Accusation on Accused—Waiver of Right. Section 20 of the Bill of Rights gives to the accused in a criminal prosecution a constitutional right to have a copy of the accusation against him. The accused may waive this right, and, unless he demands a copy before announcing ready for trial, his right to a copy is waived.

2.  HOMICIDE—Evidence—Admissibility—Self-Defense. In a homicide case, where the plea is self-defense, evidence as to whether the accused was intoxicated or under the influence of intoxicating liquors at the time of the homicide is competent for the purpose of aiding the jury to determine whether or not the accused acted under the influence of a well-grounded and reasonable belief that he was in imminent danger of losing his life, or receiving great personal injury.

3.  WITNESSES — Cross-Examination — Scope and Extent. As the general reputation of any person is established by the opinions of witnesses as to the general estimation of his character, it is permissible upon cross-examination of such witness to show the sources of his information, and particular facts may be called to his attention, and he may be asked if he ever heard of them. This is permissible, not for the purpose of establishing the truth of such facts, but to test the credibility of the witness, and to ascertain what weight or value is to be given to his testimony.

4.  APPEAL AND ERROR—Writ of Error—Objections to Evidence—Scope and Sufficiency. When objections to a question are sustained, if it is desired to reserve the question as to the competency of the testimony sought to be introduced for the determination of this court, the record must contain some showing as to what the testimony of the witness would have been had he been permitted to answer the question. Otherwise this court cannot determine as to whether the accused has been injured by the ruling of the trial court.

5.  APPEAL AND ERROR—New Trial—Review—Discretion of Trial

**Court.** Where, in a motion to set aside the verdict and grant a new trial, an attempt is made to show that one of the jurors was prejudiced against the accused, and an affidavit is attached to the motion showing prejudgment statements by a juror, and the state files a controverting affidavit of the juror wherein he denies that he made any such statements, in the absence of a showing of abuse of discretion, the decision of the trial court will not be disturbed.

6. **APPEAL AND ERROR**—Review—Harmless Error—Impaneling **Jury.** As a general rule, a verdict will not be set aside for reasons that would be sufficient to disqualify a juror on a challenge for cause, which existed before the juror was sworn, but which was unknown to the accused until after the verdict, unless it appears from the whole case that the accused suffered injustice from the fact that the juror served in the case.

(Syllabus by the Court.)

*Appeal from District Court, Coal County; A. T. West, Judge.*

W. H. Stouse and another were convicted of manslaughter in the first degree, and appeal. Affirmed.

The plaintiffs in error were, by indictment, jointly charged as having, on the 25th day of December, 1908, in Coal county, feloniously, without authority of law, and with premeditated design, killed one J. T. Bunch. The record shows that there were some 10 persons who claim to have been eyewitnesses to the tragedy.

The proof on the part of the prosecution tends to show the following facts:

Geo. Wheeler, the first witness called for the state, testified: That he was talking to the deceased just before the shooting commenced. That the defendants were passing along the street, and Stouse spoke to Dud Jackson, a cousin of the deceased, and told him to be less boisterous. The deceased was walking across the street at the time, and said to the defendants, "Now, if you fellows are game, go and get him. He has hollowed again." The defendant Stouse said, "No; we will get you;" and the deceased said, "No; you won't;" and the defendants both drew their guns and shot the deceased five or six times, killing him instantly. That, when the first shot was fired, the deceased fell,

and several shots were fired while he was down. That the defendant Stouse said, "Now you will give up, won't you." That he did not see a gun in the hand of the deceased.

John Adair testified that he went to the defendant Stouse's house with Geo. Causey and Ed Wooten about 11 o'clock, and both the defendants were there, and Stouse had a bottle of whisky and offered Geo. Causey a drink; that the defendants appeared to be drinking; that he heard the defendant Kennedy make a threat against the life of the deceased, but did not remember whether it was right at that time; that he had heard Kennedy more than once threaten the life of the deceased; that Kennedy told him that he would kill the deceased if he ever got a chance; that such threats were made by Kennedy off and on for a year and a half before the killing; that shortly after the killing Kennedy told him that he hated to have done it, but it did not bother him like he thought it would.

Dr. Frank Bates testified that he was called as a physician, and found Bunch dead; that he made an examination to see what the cause of his death was; that there was a gunshot wound under the arm which went straight through the body; that there were two wounds in the abdomen and four on the left leg.

Joe Cathcart testified that in October or November preceding the tragedy the defendant Kennedy stated to him "that he and Bunch were kin folks, and had right smart of trouble, and the last trouble he had he told him if he ever spoke to him again he would kill him."

Mrs. Ester Myers testified that she knew the deceased in his lifetime, and the defendants; that her home is about 100 feet from where the killing occurred; that she heard four shots and went to the window, and saw the deceased lying in the middle of the street, and Mr. Stouse standing at his feet with two six-shooters in his hand, and Mr. Kennedy, standing at his side, fired one more shot, the last shot that was fired, and it looked like it might go through Mr. Bunch's side. That she heard Stouse say, "Keep him off, or I will kill him;" that she did not know what he meant unless it referred to Dud Jackson; that

6 Cr.—14

the defendants walked away, and she went to where Mr. Bunch was lying; that she did not see anything in his hands.

Herman Whitt testified that he lived about 100 yards from where the killing occurred; that he was looking at the defendants and deceased when the shooting occurred; that the defendants were both shooting; that the deceased fell down, and that, after he fell, the defendant Kennedy fired one or two shots; that he could not tell whether the deceased had a pistol or not.

Frank Logsden testified that about a year before, he heard the defendant Kennedy say, speaking of the deceased: "We had trouble once. I told him, if he ever spoke to me or came to my house, I am going to throw lead bullets in him, and by God, I mean to make my word live."

Guy Bounds testified that he was on the porch of Mr. Acock's house, about 50 yards from where the killing took place; that the defendants were coming up on the north side of the street when they met the deceased, who was standing in the middle of the street; that the defendant Stouse walked out into the street where the deceased was; that he could not hear what was said, but the deceased hit at him, and Stouse drew his gun, and went to shooting; that Kennedy then commenced shooting; that there were six or seven shots fired.

Mrs. Freelove Bunch testified that she was the mother of the deceased; that, hearing the shooting, she went to where her son was and went up to him, and asked him if he could speak, and, when she raised him up, Bill Stouse was standing with both pistols leveled down on him; that Stouse said, "Mrs. Bunch, I hated to do this as bad as you do, but I had to do it"; that some one asked Kennedy who did it, and he said: "I am the fellow that killed him. I am the man that killed him."

Several witnesses testified that they had heard the defendant Kennedy at various times threaten to kill the deceased.

On behalf of the defendants, Jim Skeith testified that he is a brother-in-law of the defendant Stouse, that he saw the defendants and the deceased when they met; that he saw Bunch strike at Stouse with his fist; that he was looking through a win-

dow then, and he stepped out on the porch and saw Bunch strike at Stouse again; that he saw him strike three times; that Stouse said, "Baldy, go on and behave yourself. I do not want to have any trouble with you;" that Bunch stepped back, and said, "You God damn bully sons of bitches. I will kill both of you," and run his hand in his pants and drew a gun and fired at Stouse; that the next thing all of them were firing their guns about the same time; that Bunch stood until he fired two shots, and then staggered, and fired another shot and fell, and then fired another shot after he fell, that Stouse then threw his gun down on Bunch, and says, "Baldy, don't fire any more, throw that gun down. I do not want to kill you;" that Stouse picked up a gun from the street and carried it off with him; that the shooting occurred about 1 o'clock.

Iva Stouse testified that she was a step-daughter of Jim Skeith, and the defendant "W. H. Stouse is my uncle"; that she was standing on the porch when her uncle and Mr. Kennedy met the deceased, who was in the middle of the street; that he came up near to where the defendants were and said, "Oh, you bullies, you sons of bitches, I am going to shoot you both;" that he drew back and struck three licks at her uncle and jerked his gun and fired two shots; that the defendants drew their guns and fired three shots apiece, and, after he fell, he raised up on his left shoulder and fired two more shots; that the first and the last shot was fired by the deceased; that she did not hear the defendants say anything.

Bessie Williams testified that she was at Jim Skeith's, visiting Iva Stouse, and was on the porch when the shooting took place; that she saw the defendants when they met the deceased, and the first thing that happened the deceased pulled a gun out of his right hip or some place on the right side and fired twice; that she did not see any other shooting. On cross-examination she stated that she did not hear more than two shots.

Delbert Wise testified that he was standing on the street when the defendants came walking up the sidewalk, and Mr. Bunch came walking down the middle of the street, and Mr.

Jackson was going down the street, hollowing, and Stouse said, "Dud, don't start any disturbance;" that Mr. Bunch then said that, "if you sons of bitches, if you feel like starting it," and struck at Mr. Stouse; that after he struck him the shooting commenced and he ran; that Mr. Bunch fired the first shot.

Hilda Robertson testified that she witnessed the tragedy, and when the deceased met the defendants, Mr. Stouse told him that "he did not want to have any trouble with him," to go on and have a good time, he "did not want to have any trouble with him;" that Bunch said, "You damn sons of bitches, I will kill you," and then he shot at Mr. Stouse; that she did not see any other shooting, although she stood on the porch until after it was over with.

Mr. Trice, counsel for the defendants, then stated: "We have been surprised in this witness. I believe we have a right to lead." In response to leading questions, she then stated she saw Mr. Stouse shoot once, and that she saw Mr. Bunch shoot twice after he fell, and that the last shot was fired by Mr. Bunch.

Mrs. Lou Olmstead testified that she saw the defendants and the deceased come together; did not hear what they said, but saw Mr. Bunch hit Mr. Stouse with his right hand; that he struck three times at him, and got his pistol from his bosom and shot at Mr. Stouse; that she could not say how many times Mr. Bunch shot; but he shot twice after he fell; that Mr. Stouse fired a shot, but she did not see Mr. Kennedy shoot; that Stouse picked up a pistol from the street, and then walked back to the sidewalk.

J. M. Wilson testified that he was a justice of the peace in Coalgate; that Kennedy was his constable and Stouse was his deputy; that Kennedy was a city marshal; that he saw the two defendants about 11 o'clock, and they were duly sober to the best of his knowledge; that they drank some weak eggnog at his house before noon; that after the shooting they came to his house, and he examined the three pistols they had. Two of the

pistols were loaded all around, and one of them had two loads, four empty chambers in it. He also testified as a character witness for the defendant Kennedy.

J. W. Hurst testified that he met the defendants about five minutes before he heard the shooting, and talked with them; that, if they were under the influence of whisky, he could not tell it.

Hattie Wise testified that she was the wife of Delbert Wise; that she saw the defendants and the deceased when they met before the shooting; that she did not hear what was said, but Mr. Bunch struck at Mr. Stouse three times; that Stouse pushed him back, and Mr. Bunch fired; that Mr. Stouse then fired; that Mr. Bunch fired two shots before he fell, and two after he fell, one of them being the last shot that was fired; that her husband was standing on the sidewalk close to Mr. Stouse at the time; that she is the daughter of Mrs. Lou Olmstead; that the deceased was wearing an overcoat, but she did not see where he took the pistol from.

W. H. Stouse testified on behalf of himself and his codefendant, that he was 43 years of age; that at the time of the homicide he was city marshal or chief of police of Coalgate; that the defendant Kennedy took dinner with him that day at his home; that they then walked downtown and met Mr. Bunch coming across the street. To use his own language, he then stated:

"When they got up tolerable close, he made a remark: "There is them two bully sons of bitches; I want both of them;' and when he said that he grabbed his coat—he had on an overcoat and a dress coat—and started to throw it back, and I laid my hand on his arm. I says, 'Go on.' He just threw his hand up like that, and threw his coat backward, and says, 'God damn you,' and struck. I just guarded the lick off, and, when I done that he made the next pass at me, I threw my hand against him, and, when I pushed him back, and when I straightened up the next time he had a gun. I don't know where he got it. When I first saw it as I straightened up, he had it, and I hadn't more than saw it till he pulled the trigger."

That he then fired another shot toward him.

"Q. What next happened? A. When he fired the next shot, of course, I was getting my gun out, and, when he fired the next

shot, I had my gun out. I dodged back, the smoke and powder in my eyes, and, as I straightened, the three shots, the one I supposed he shot at Kennedy, and my shot and Mr. Kennedy's shot, I reckon they all three went together. Q. Then what next happened? A. When I fired the first shot, he staggered back it seemed to me about two steps to the best of my knowledge. The first shot I fired I just jerked my gun, and threw it .right down, and fired. It wouldn't have hit—in my judgment it wouldn't have hit him in the body. I didn't have my gun high enough. As we all three fired, he started and just sort of sank down. I couldn't tell whether he was falling or squatting, but, as he squatted down, I fired my last shot. I fired just as he stepped back, before he squatted down. I shot again after he fired a shot, and then you might say we practically all three shot together, and when that shot was fired, he fell to the ground on his left side, and, as he fell, he dropped on the ground like that, and threw his gun on his hip, and fired his gun, and, when he done that, I threw my gun on him, and said: 'Baldy, drop that gun. I don't want to kill you, but I will have to.' He looked at me. and let it go, and it fell, and I reached over him and picked up his six-shooter, and went to the sheriff."

On cross-examination he testified that he was duly sober, that he had only drank about half a glass of eggnog at Judge Wilson's, and a half bottle of beer at home.

J. E. Kennedy testified on his own behalf and on behalf of his codefendant: That he was a constable of Coalgate township. That on the day in question, when they met the deceased, he heard him say: "Both of you bully sons of bitches can't run me off the street. I am out here to get both of you sons of bitches." That Stouse asked him to behave himself, and kind of put his hand out, and witness stepped a couple of steps beyond Stouse, and· was standing with his hands behind him, and the deceased, standing in the street, put his right foot on the sidewalk, and says, "God damn you, Bill Stouse," and struck at him two or three times, and then jerked a gun from somewhere in front of him, "somewhere from his hip like that," and fired at Stouse; that he stepped up. and says, 'Baldy, for God's sake don't do that,' and he said, 'You son of a bitch, I want you, too,' and flung his gun on me. I reached for my gun, and me and

Bunch fired together, and I fired three straight shots as fast as I could;" that the deceased fired one shot after he fell on the ground; that that was the last shot fired; that he shot the deceased in self-defense to save his own life; that his wife and the wife of the deceased were sisters; that, when his wife separated from him, she went to the home of deceased on their father-in-law's place; that the next time they separated that his wife went to her father's; that shortly thereafter she returned to witness; that he did not make the threats to kill the deceased as testified to, but did warn him to keep away from his place.

Upon the trial the jury returned a verdict finding the defendants guilty of manslaughter in the first degree, and assessing their punishment at imprisonment in the penitentiary for six years and six months. July 12, 1909, judgment and sentence was pronounced and entered in accordance with the verdict.

To reverse the judgment and order denying a new trial, the defendants appealed by filing in this court on January 11, 1910, their petition in error with case-made.

*Fooshee & Brunson* and *George Trice,* for plaintiffs in error.

*Chas. West,* Atty. Gen., and *Smith C. Matson,* Asst. Atty. Gen., for the State.

DOYLE, J. (after stating the facts as above). The assignments of error and the questions presented thereon in so far as they seem to warrant discussion and decision will be considered in the order of time upon the trial.

The indictment was returned and filed in open court on March 12, 1909. The defendants were arraigned March 15th, and were then enlarged on bail. June 30th the case was called for trial. The state and the defendants announced ready, and, after the jury had been impaneled and sworn, the defendants interposed an objection to proceeding further with the trial for the reason that they had not been served with copies of the indictment as required by the Constitution and laws of the state.

The state called the clerk of the court, who testified that he furnished copies to the defendants' attorneys, but did not re-

member who received them; that he made no record of the delivery or receipt of such copies; that he also offered copies to the defendants, and they refused them, saying they had attorneys to attend to their case. Each of the six attorneys appearing for the defendants testified that he had not received a copy of the indictment. The court, after hearing the testimony, overruled the objection, and the ruling is assigned as error.

Our Constitution (section 20, Bill of Rights) prescribes: "In all criminal prosecutions the accused * * * shall be informed of the nature and cause of the accusation against him and have a copy thereof. * * *"

The defendants had a constitutional right to have copies of the indictment. It follows that there was error as contended by counsel, unless the defendants could and did waive this right. A defendant in a capital case is not to be presumed to waive any of his constitutional rights, but that he may waive such rights has often been judicially determined. In the case of *Starr v. State*, 5 Okla. Cr. 440, 115 Pac. 356, it was said that where a constitutional right in a criminal cause is largely for the benefit of the accused, or in the nature of a personal privilege, the law is well settled that an accused may waive such right. Mr. Bishop says:

"Any right given by statute or otherwise to the defendant for his benefit, such as to have a copy of the indictment, or a list of the jurors, or of the witnesses against him, at a particular time or before trial, may be waived, either in words, or by omitting to apply for the thing. And if, for example, the copy of the indictment furnished him is incomplete, he cannot first object after trial." (Bishop's New Crim. Proc. par. 126.)

That there was a waiver by the defendants of this right can be neither doubted nor denied. It appears from the record that the defendants were enlarged on bail more than three months preceding the trial, and they could at any time have demanded copies of the indictment. The record shows no application for the benefit of such privilege. On the other hand, it shows that the clerk tendered the defendants copies of the indictment which they refused to accept. The language of the provision is per-

missive, "The accused shall have a copy thereof;" that is, he may have if he request. If he does not request, then he cannot complain that a copy was not forced upon him. It was held in the case of *Blair v. State,* 4 Okla. Cr. 359, 111 Pac. 1003, that, unless the defendant demands a copy of the accusation before announcing ready for trial, his right to a copy is waived.

The objection was properly overruled.

Objections were made and exceptions taken to rulings in admitting and rejecting evidence. These rulings are collectively assigned as error.

The first is error in admitting evidence that the defendants were drinking intoxicating liquor shortly before the homicide. We have no difficulty in determining that the ruling of the court was undoubtedly correct. Prof. Wigmore says:

"Intoxication, as a mental condition of temporary stupefaction, may be evidenced circumstantially in the same general modes that are available for mental capacity or condition in general. (1) It may be evidenced by the person's conduct. (2) It may be evidenced by predisposing circumstances; i. e., by the drinking of intoxicative liquor. (3) It may be evidenced by his prior or subsequent condition of intoxication within such a time that the condition may be supposed to be continuous."

"Intoxication, if it is of such a degree as to deserve the name, involves a numbing of the faculties so as to affect the capacity to observe, to recollect, or to communicate; and is therefore admissible to impeach." · (Wigmore on Evidence, §§ 235, 933.)

It is said by the Supreme Court of Illinois in the case of *Miller v. People,* 216 Ill. 309, 74 N. E. 743 (this was a murder case; Miller as village marshal shot and killed a man, and his plea was self-defense) :

"In order to arrive at a just and proper conclusion as to the reasonableness of the acts of the plaintiff in error on the occasion in question, we think it not at all improper that the jury should have known that he was intoxicated, if such was the fact. His ability to see and comprehend what was occurring, and to form therefrom a reasonable and well-grounded belief that he was in danger of losing his life or suffering great bodily harm, would be affected, in a greater or less degree, by intoxica-

tion. A man in a state of intoxication may, because therefrom, misconceive his situation and surroundings, misapprehend the acts and conduct and purposes of others, and arrive at a wholly unfounded, irrational, and unjustifiable belief of personal danger which would not find lodgment in his mind if his mental faculties were not in an abnormal condition."

The defendants claim that as peace officers they were preserving the peace when the deceased made a murderous assault upon them, and in necessary self-defense they killed him. It is a matter of common knowledge that the effect of intoxicating liquor upon the human mind is to magnify grievances, whether real or imaginary, and this evidence was competent for the purpose of aiding the jury in determining whether the defendants acted under the influence of a well-grounded and reasonable belief that they were in imminent danger of losing their lives or receiving great personal injury, or whether the killing was the result in whole or in part of a drunken disregard for human life.

J. M. Wilson, as a witness for the defendants, testified that he was a justice of the peace in and for Coalgate township, Coal county; that the defendant Kennedy was constable and marshal of Coalgate township and city, and the defendant Stouse was his deputy at the time of the homicide; that Kennedy was a prudent officer, and never drew his gun in making an arrest; that he chided him on different occasions for not using his gun enough; that he had known Kennedy for three years, and knew his general reputation and character for peace and quiet, and as being a law-abiding citizen, and that it was good. On cross-examination he was asked to state if he ever heard any person or persons talking about Kennedy and his mistreatment of his wife, and saying that he had handcuffed her, and whipped her with the belt of his pistol, and he answered, "I have heard it from one or two persons."

The wife of the defendant Kennedy was next called as a witness for the defendants, and was permitted to testify, over the objection of the state, that the deceased and his family caused her to leave the defendant, her husband, on two occasions, and that the defendant was a good husband to her, and that he did

not whip her.  On cross-examination she was asked if on one of the occasions of leaving her husband she went to the home of the deceased, and exhibited bruises on her body to her sister, the wife of the deceased, and her mother, Mrs. England, and told them that her husband had whipped her with a pistol belt, and she answered, "No, sir."  We cannot conceive upon what theory the testimony of Mrs. Kennedy was admissible.  The inquiry upon the cross-examination of Wilson, the only character witness testifying, was directed to the witness hearing reports of. acts of misconduct, and not of the fact of misconduct.

As the general reputation of any person is established by the opinions of witnesses as to the general estimation of his character, it is permissible upon cross-examination of a character witness to show the sources of his information, and particular facts may be called to his attention, and he may be asked if he ever heard of them.  This is permissible, not for the purpose of establishing the truth of these facts, but to test the credibility of the witness, and to ascertain what weight or value is to be given to his testimony.

The state in rebuttal was permitted to introduce the testimony of Mrs. Bunch, the wife of the deceased, and Mrs. England, the mother of Mrs. Kennedy, to the effect that Mrs. Kennedy on the occasions of leaving her husband came to their home and exhibited bruises on her body, and said they had been made by her husband whipping her.  Counsel insist that the court erred in admitting this rebuttal testimony.  We believe that, in view of the fact that the collateral issue was raised by the evidence introduced on the part of the defendants, they cannot now he heard to complain of an erroneous ruling of the court thereon.

It is also insisted that the court erred in refusing to permit the defendants to introduce material evidence in their behalf. From a careful examination of the record we are led to believe that the rulings of the court on the admission of evidence were more than favorable to the defendants.  It is impossible to determine from the record what evidence was intended to be introduced, because no offer to prove was made.

"When objections to a question are sustained, if it is desired to reserve the question as to the competency of the testimony sought to be introduced, for the determination of this court, the record must contain some showing as to what the testimony of the witness would have been had he been permitted to answer the question. Otherwise this court cannot determine as to whether the defendant has been injured by the ruling of the trial court." (*White v. State,* 4 Okla. Cr. 143, 111 Pac. 1010.)

The record shows that the defendants took no exception to any of the instructions given, and the instructions criticised in plaintiffs in error's brief were not set out in the defendant's motion for a new trial. The instructions as given by the court fully and fairly present the law of the case.

Error is assigned on the refusal of the court to give a requested instruction on the right of a third person, viewing an attack made by one person on a second person, to slay the attacking party, when it appears necessary to save life or prevent great bodily injury. This instruction was properly refused. It was not in the abstract a correct statement of the law, and neither of the defendants claimed or testified that he shot in defense of the other; both testifying that the deceased shot at each of them before either of them shot the deceased.

Error is assigned upon the order of the court refusing to set aside the verdict and denying a new trial. One of the grounds of the motion is:

"That prior to the time of the trial and subsequent to the time that the crime is alleged to have been committed in this case, Sam McCutchen, one of the jurors who tried the case, was heard to say that he wanted to get on the jury that tried this case, and hoped that he would be able to get on the jury that tried this case, and that these defendants ought to be hung; that if he was successful in getting on the jury that he would hang the defendants, if possible, or that he would give them 99 years in prison or the most severe punishment that he could cause to be inflicted upon them; that he was very bitter in his remarks against them, and he would endeavor to inflict the punishment aforesaid regardless of what the law or the testimony was; that at the time that Sam McCutchen was accepted on said jury, neither the defendants nor their attorneys knew that he had made such

statements, or that he had formed or expressed any opinion, or had any fixed opinion as to the guilt or innocence of the defendants, or that he had ever expressed any desire to be on said jury; that if said juror made the statement aforesaid, and had a fixed purpose in his mind as aforesaid, that he was at the time that he was accepted on said jury an incompetent juror, and that the defendants could not have been tried by a fair and an 'impartial' jury as provided by the Constitution of the state of Oklahoma; that the affidavit of R. O. Parish sustaining the allegations aforesaid is hereto attached, marked 'Exhibit A.' ''

In reply to said motion and the affidavit thereto attached, the state filed the controverting affidavit of said juror Sam Mc-Cutchen. On the issue of fact thus raised testimony was taken, and the juror Sam McCutchen testified that he had never made any such statements. It is contended by counsel that:

"It is error in a capital case for the trial court to refuse to grant a new trial when it appears that one of the jurors who tried the case had formed and expressed an opinion adverse to accused, when such juror has qualified on his *voir dire,* and his disqualification is unknown to the accused or their counsel at the time such juror is accepted."

The identical question here presented was considered in the case of *Smith v. State,* 5 Okla. Cr. 282, 114 Pac. 350, wherein this court said:

"These affidavits presented a question of fact which was submitted for determination to the trial court. The judge who tried this case for many years had resided in Coal county, and was in a much better condition to determine as to whether the juror or the parties whose affidavits were filed in behalf of the appellant were the most credible. The mere fact that two parties attempted to impeach a juror does not by any means settle the question of credibility as between such parties and the juror. If it did, but few verdicts could be sustained, because in almost any case it would be possible to find two or more persons who would make affidavits impeaching a juror. In passing upon this very question, the Supreme Court of Texas in the case of *Gilleland v. State,* 44 Tex. 357, said: 'It is true that there are two affidavits in support of the motion and one in rebuttal, but we do not think that the decision of the question presented by the motion should necessarily depend upon the mere number of affidavits on one side over the other.' The question of credibility was one

to be determined by the trial court; and, in the absence of a showing that this discretion was abused, it cannot be reviewed here. There is nothing in this record to indicate any abuse of discretion on the part of the trial judge."

It is well settled that, as a general rule, a verdict will not be set aside for reasons that would be sufficient to disqualify on a challenge for cause which existed before the juror was sworn, but which were unknown to the accused until after the verdict, unless it appears from the whole case that the accused suffered injustice from the fact that the juror served in the case. The juror denies that he made any such statement, and the verdict returned, not only corroborates him, but is almost conclusive of the fact that the defendants were tried by a fair and impartial jury.

Upon a careful consideration of the whole case, we find no error prejudicial to the substantial rights of the defendants.

Wherefore the judgment of the district court of Coal county is affirmed.

FURMAN, P. J., and ARMSTRONG, J., concur.