Johnny W. BAGWELL, Plaintiff In Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–12561.

Criminal Court of Appeals of Oklahoma.

March 5, 1958.

Rehearing Denied June 11, 1958.

Rehearing Opinions as Modified June 25, 1958.

Elmore A. Page, Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

POWELL, Judge.

Johnny W. Bagwell, plaintiff in error, hereinafter referred to as defendant, was charged by information in the county court of Ottawa County with the offense of unlawful transportation of intoxicating liquor, specified as 846 bottles of assorted brands. A jury was waived.

The record reflects that prior to the trial, the defendant filed a motion to suppress evidence on the ground of an illegal search and seizure. This motion was overruled after hearing, and by stipulation of the parties, the evidence introduced at the hearing on the motion to suppress was considered by the court as evidence in the trial of the case.

The court thereupon rendered judgment finding the defendant guilty as charged, and assessed punishment at thirty days confinement in the county jail, and a fine of $250 and costs of prosecution.

For reversal but one question is presented, and being whether the trial court committed error in overruling defendant's motion to suppress evidence on the asserted ground of an unlawful search and seizure.

Counsel for defendant argues that: "The evidence clearly and conclusively reflects and shows that the pursuit and arrest of defendant by officers Peck and Lawson * * * was for the sole purpose of checking defendant's vehicle for intoxicating liquors, and that such arrest was a subterfuge, and that the charge of speeding was a subterfuge used by said officers, in attempting to legalize their pursuit, arrest, and search of the defendant and his vehicle."

Of course, even if the officers had probable cause to believe that defendant's automobile was loaded with whiskey, still, in a misdemeanor case, a search without a warrant cannot be legally justified. Wallace v. State, 49 Okl.Cr. 281, 294 P. 198; Brinegar v. State, 97 Okl.Cr. 299, 262 P.2d 464; State v. Simpson, 91 Okl.Cr. 418, 219 P.2d 639; Edwards v. State, 83 Okl. Cr. 340, 177 P.2d 143.

We see, then, that if the defendant did not as a matter of fact commit an offense in the presence of the officers, in the absence of a warrant they would not be entitled to arrest and search his car. The offense must be real, and not some triviality, excuse or subterfuge to enable the officers to make a search. For cases with varying fact situations where we have so held, see Hoppes v. State, 70 Okl.Cr. 179, 105 P.2d 433; Leach v. State, 94 Okl.Cr. 334, 235 P.2d 968; Saltsman v. State, 95 Okl.Cr. 228, 243 P.2d 737; McCormick v. State, Okl.Cr., 277 P.2d 219; Barnett v. State, 94 Okl.Cr. 293, 235 P.2d 555. See also Byford v. State, 90 Okl.Cr. 230, 212 P.2d 476 where the arrest of a truck driver did not entitle the officers to search the truck, but where the owner of the truck thereafter unlocked the truck (probably thinking they would break in anyway) and invited the officers to search, thus waiving his rights.

With the above cases for guidance, still, in commencing the examination of the evidence to support defendant's motion to suppress there are some other well developed principles to be kept in mind:

first, there where a defendant files a motion to suppress, the burden rests on him to offer evidence in proof of the allegations contained in the motion (Edwards v. State, Okl.Cr., 319 P.2d 1021; O'Dell v. State, 80 Okl.Cr. 194, 158 P.2d 180; Wilson v. State, Okl.Cr., 268 P.2d 585); and, second, that whether search and seizure from an automobile is reasonable is, in its final analysis, to be determined as a judicial question, in view of all the circumstances under which it is made. Such being so, this court will not reverse the trial court upon a question of fact where there is a conflict of evidence, and there is competent evidence reasonably tending to support the finding of the trial court. Wood v. State, Okl.Cr., 316 P.2d 628; Franklin v. State, Okl.Cr., 281 P.2d 204; Kirk v. State, 92 Okl.Cr. 360, 223 P.2d 558; Scott v. State, 84 Okl. Cr. 171, 180 P.2d 196.

The first witness called to support the motion to suppress was Art Peck, deputy sheriff of Ottawa County, who said that he saw the defendant the night of December 14, 1956 and arrested him. The officer stated that he and his partner, Bill Lawson, drove up to the stop sign from the west and at the junction of highway 60 with 66, and stopped, awaiting traffic to clear. He said that he noticed a light-colored Chrysler car proceeding west come to a complete stop on the opposite side of highway 66, and that it then crossed over and passed them and proceeded on west, and that they noticed defendant's car right behind the Chrysler as it approached highway 66 slow down but that it did not stop. He further testified that as soon as defendant passed them, the back wheels of his car were throwing gravel and that he was going pretty fast so that witness and officer Lawson turned their car around and proceeded to turn on their siren and chased defendant for about a mile. He estimated defendant's speed at ninety miles per hour or better. He said that after defendant had stopped his car witness' car was stopped and witness got out and approached defend-

ant, and told him that he was under arrest for speeding and reckless driving. Witness said that his partner, officer Lawson, after letting him out, drove on in effort to stop the Chrysler car. Witness admitted that he shot his pistol into the air four times in an effort to get defendant to stop, but denied that he shot at defendant or his car. Witness said that when he arrested defendant he observed packages in the back seat of his car; that some of the packages had been broken in the chase and he smelled liquor[1] and recognized the packages as liquor packages. He proceeded to search the car and found approximately sixty cases of whiskey. He subsequently took defendant to jail and filed charges in the justice of the peace court against defendant for speeding in the day time, and defendant plead guilty to such charge and paid a fine. It was agreed that defendant was not represented by counsel in the justice of the peace court. The within charge was then filed in the county court.

Witness denied that prior to the time of the arrest of defendant he had parked at the intersection of highways 60 and 66, and denied that officer Lawson made such a statement to the defendant. Witness denied that he was looking for any particular car when defendant approached highway 66, or that he was looking for the light-colored Chrysler car and defendant's car. He denied that he had a conversation with Mr. Taylor of Afton (endorsed on the information as a witness) within eight hours prior to the arrest respecting two cars of similar description as the two cars in question, or had any conversation with anyone else connected with the law enforcement in Afton respecting two cars described similar to the ones they chased at the time of defendant's arrest. Witness identified the defendant at the trial as the person he arrested and the arrest as having been made in Ottawa County. Witness reiterated that prior to seeing defendant at the intersection of highways 60 and 66, and arresting him, he had no knowledge or in-

1. See Sands v. State, 36 Okl.Cr. 55, 252 P. 72.

formation about defendant's car or the occupant. He said that at the time of the arrest defendant was driving a 1953 Chrysler New Yorker, four-door sedan, blue color.

The defendant next testified and said that his name was John Wayne Bagwell, and denied that he had ever been convicted on any offense except traffic violation. Defendant denied that he failed to stop his car at the intersection of highways 60 and 66, as testified by officer Peck, but on the contrary said that he stopped and thereafter "took off" in a normal manner, and was driving at a speed of about 25 or 30 miles per hour until he saw the officers turn their car and commence pursuing him; that he did not immediately recognize them as officers and that he thought they might be hi-jackers, and admitted that he drove his car about ninety miles per hour. He admitted that he heard the officers' siren and the shots, and saw the red light, and finally decided to stop. He said that after he stopped officer Peck came up and said, "You are under arrest", and then looked in defendant's car. Defendant admitted that some of his whiskey bottles had been broken, and that one could smell the odor of whiskey, but said that a blanket covered the whiskey. Witness said that he had a conversation with officer Peck as to why he happened to pursue him. Said he: "Well, he said he was glad that he had got there because they had been waiting about two hours and he was supposed to have gone off work or duty about eight or eight thirty. At that time it was about nine o'clock. He mentioned something about missing his breakfast, or something." Witness denied that he had violated any speed laws prior to the officers commencing the pursuit.

On cross-examination defendant was asked why he didn't stop for the officers, and answered: "I was loaded with whiskey".

William Lawson, deputy sheriff, testified to being with deputy Peck the early morning of December 14, 1956 when defendant was observed at the intersection of highways 60 and 66. He said that he was the driver of the officers' car, and had just stopped his car on the west side of highway 66 and observed defendant approaching along highway 60 from the east, and that defendant failed to stop at the intersection. His testimony was substantially as that of officer Peck, except some variance to be pointed out.

Witness said that as defendant passed the officers' car they glanced over at him, and did not like his looks and decided to take a look at him and commenced turning their car around and defendant "took off fast".

Witness testified that it was about 4 a. m. when his regular buddy quit him and he called officer Peck to accompany him the balance of the night. He said the rules required two officers to ride together.

Witness was asked if there was a deputy sheriff who lived in Afton named Myers, and answered in the affirmative, and said that he drove a new two-tone green Studebaker car. He was asked if he talked to Mr. Myers at any time the early morning of December 14, 1956 and answered that he met him once at Eagle, and that at the time J. D. Lawrence was riding with witness; that about one and a half hours later witness called officer Peck to ride with him in the place of Lawrence. Witness said that when he talked with Myers he also talked with officer Taylor (two witnesses endorsed on information) but denied that Taylor mentioned any two cars they had followed for a short time before. Witness said that prior to officer Peck joining him that he stopped and talked to a friend at the intersection of highways 60 and 66; that later officer Peck joined him near that point and the other officer, who had been riding with him, got out. Witness said that he thought they had talked by radio phone with officers Myers and Taylor. He denied that they had set up a road block, and denied that defendant had told witness and Lawson that he almost came though Siloam Springs and that one of the officers had told defendant that it did not make any differ-

ence which road he might have used, they had him covered.

The defendant Bagwell was recalled as a witness and testified that prior to his arrest the morning of December, 14, 1956 at approximately 4:30 or 5 o'clock he drove through Afton and he and the driver of the Chrysler car accompanying him stopped there at a service station and got their tires aired up and that he noticed a two-tone green 1956 Studebaker with a long aerial behind the back seat parked behind the building; that as witness left he noticed the Studebaker being driven down highway 66 so he drove on to a back road that led to the highway and that he noticed the Studebaker turn off on a dirt road and then its lights were turned off. He said that as officers Peck and Lawson, after arresting him, were conducting him to the justice of the peace officer he told them that he had started to come through Spavinaw and they told him it would not have made any difference which way he might have come, that they would have gotten him anyway. He did not remember which officer made the statement.

The State called deputy Art Peck in rebuttal. He was asked if he had any conversation with defendant the morning of the arrest and he said that he did. Said he: "I asked Johnny how come him to drive so fast—take off so fast. He said he seen the car and knew we were officers and he became frightened. It was his first load of liquor and he became scared."

On cross-examination witness denied that he saw Art Taylor or Mr. Myers after he went on duty the morning of the arrest, and denied that he had any communication with them by car radio; denied that any officers were at the scene of the arrest other than he and Lawson, and denied that he heard officer Lawson talk with Taylor or Myers by car radio.

Counsel in his brief argues that officers at Afton who saw defendant getting his tires aired up at that place, suspicioned that he had a load of whiskey and radioed to officers Peck and Lawson to await defend-

ant and arrest him on some pretext, and that thereafter he was actually arrested. Of course defendant could have called officers Taylor and Myers and have had them testify under oath as to whether or not they radioed ahead to either officer Peck, Lawrence or Lawson concerning defendant's automobile and their suspicions. Such evidence would have been admissible as having a bearing on whether defendant failed to actually stop at the intersection of highways 60 and 66. The burden was on defendant to support his theories with evidence. No doubt such argument was made to the trial court. The trial court held against defendant. To justify this court in reversing the case we would have to accept the testimony of the defendant as true and reject the testimony of the two officers as to the facts of the arrest. Defendant did not deny that when the officers by turning their car and showing interest in his car that he did speed up to ninety miles per hour. The record would not support the reversal of the ruling of the trial court, and we are forced by reasons of the principles heretofore set out and taken from Wilson v. State, supra, and Wood v. State, supra, and the other cases cited to affirm the judgment of the trial court.

Judgment affirmed.

BRETT, P. J., concurs.

NIX, J., dissents.

On Petition for Rehearing

BRETT, Presiding Judge.

█ The defendant lays great stress on the trial court's exclusion of evidence which might have been elicited by certain questions, fully detailed in the dissenting opinion, had the trial court not sustained objections thereto before the answers were given. It is asserted that a different light might have shown upon the matter had witnesses been required to answer the questions propounded by defendant's counsel. That speculation may be true, but under the decisions of this Court, we are not per-

mitted, on the showing made by the asking of bare questions, to engage in supposition as to what the answers might have been. If the defendant's counsel knew what the answers would be, he could readily have made the questions available to this Court by making an offer of proof as to what the answers to the questions would have been. This he did not do, but instead left the answers to the questions as a mere matter of speculation and supposition. Hence, we are not at liberty to consider the questions, standing alone, as of any probative value. It has so been expressly held. In Cheeves v. State, 18 Okl.Cr. 480, 196 P. 726, 729, the rule is stated:

"Error cannot be predicated upon a ruling excluding testimony, where the testimony desired is not shown in the record, nor any statement made as to what the proposed testimony would be. White v. State, 4 Okl.Cr. 143, 111 P. 1010; Warren v. State, 6 Okl.Cr. 1, 115 P. 812, 34 L.R.A.,N.S., 1121; Stouse v. State, 6 Okl.Cr. 415, 119 P. 271."

A fair illustration of this situation is found in Johnson v. State, 15 Okl.Cr. 297, 176 P. 256, 258, where, in the body of the opinion, it was said:

"Where it is contended that the court erred in refusing to admit competent evidence offered by the defendants, there must be some showing as to what the witness would have testified to had he been permitted to answer the question. Counsel argue, 'Suppose the answer of the witness had been favorable to the defendant.' This court cannot deal in suppositions in connection with the alleged errors of this kind. *The burden is upon the appellant to show that he was prejudiced by the court's action; the rule in this jurisdiction being that injury is not presumed because of error, but that the burden is upon the appellant to show not only error, but injury resulting therefrom.*" (Emphasis supplied.)

Fain v. State, 14 Okl.Cr. 556, 174 P. 296. In Tolbert v. State, 34 Okl.Cr. 110, 245 P. 659, 660, syllabus four reads:

"When a reversal is sought on account of exclusion of evidence, the record must show an offer of such evidence so that this court may determine whether or not it was material and proper, and *whether or not the defendant was injured by its exclusion.*" (Emphasis supplied.)

In Pruett v. State, 35 Okl.Cr. 359, 250 P. 1029, 1031, it was said:

"It is impossible to determine from the record what evidence was intended to be introduced, because no offer or statement was made as to what the proposed testimony would be. * * * Error cannot be predicated upon a ruling excluding testimony, where the testimony desired is not shown in the record, nor a statement made as to what the proposed testimony would be."

In Watson v. State, 46 Okl.Cr. 36, 287 P. 816, 817, it was held:

"Failure to show what the evidence would have been had the answer been permitted prevents defendant from raising the question of the improper exclusion of evidence. *Before this court can pass intelligently and safely upon a question of this kind, it would have to know just what the witness would have testified to.*" (Emphasis supplied.)

The cases are too numerous on this point to warrant further quotation. The great weight of authority supports this view.

The object of the procedure in the foregoing cases is two-fold. First, in fairness to the trial court it informs him relative to the proposed evidence sought to be elicited by the questions propounded so that he may correct his mistake, if in error. Second, it removes the matter from speculation and provides the appellate court with substance and not just a shadow with which to deal. It may appear at first that since this ques-

tion arises on a motion to suppress the evidence and not on the trial of the merits, that the foregoing cases are not in point, and for the further reason the witnesses in such proceeding are generally adverse and unfriendly and thus it may be contended it is error for the trial court to sustain objections to the questions as are detailed in the record and in the dissenting opinion. With the latter contention we are not entirely in disagreement, but find it efficacious only if injury patently appears, for it has been repeatedly held that error without injury is not a basis for reversal. Hence, the applicability of the rule herein. By laying a proper predicate as provided in the cases cited, the questions and the proof sought to be elicited are presented to the Court on a substantial and not a suppositive basis. With only the questions as a basis for the contention on appeal, we are presented an entirely suppositive matter for consideration because the answers to the questions may have been either favorable or unfavorable to the defendant.

If we are allowed to engage in supposition at all, it could not logically be concluded the trial court's failure to permit or allow answers to the propounded questions resulted in injury to the defendant. This is obvious, since the witnesses were adverse and had already given testimony contrary to the defendant's cause. It therefore follows as a logical supposition that the testimony in answer to the propounded questions would have been unfavorable rather than favorable to the defendant. Of course, if it were perfectly manifest what the answers would have been and those answers would have been favorable to the defendant, then injury would result and such showing would constitute ground for reversal. 24 C.J.S. Criminal Law § 1789, n. 64–67, p. 592. But, such is not the situation in the case at bar. As hereinbefore stated, the answers to the questions proposed could have been either positive or negative and the defendant offered nothing to relieve the situation. Hence, although this was error, it was harmless error. The petition for rehearing is accordingly denied.

POWELL, J., concurs.

NIX, Judge (dissenting).

The testimony in the instant case so reads with subterfuge that I could not in good conscience support the majority opinion. That the testimony is contradictory I thoroughly agree and the previous decision of this court would in my opinion substantiate a decision either way. However, I firmly believe that Judge Powell's remarks in Brinegar v. State, 97 Okl.Cr. 299, 262 P.2d 464, 473, should prevail in all instances. In that case he said:

"This court has never sustained a search where the evidence as reflected by the record convinced it that the arrest was a subterfuge for a search."

I am of the opinion that a thorough review of the record supports the testimony of the defendant. His testimony reflects that at approximately 4:30 or 5 o'clock in the morning, he stopped in the town of Afton, and aired up his tires, and at that time he noticed a two-toned green Studebaker automobile, with a big, long aerial in the back seat, parked in the back of the building, and that thereafter, he proceeded East, on Highway 66, at which time he noted the above described automobile following with its lights turned off.

The testimony of Officer Lawson revealed that this description fits that of the car driven by Deputy Sheriff Myers who lived in Afton. Defendant and the companion car proceeded on their trip and were returning about 8:00 that morning, when, at the intersection of Highways 66 and 60, Officers Lawson and Peck began pursuit. Officer Lawson testified he observed the two cars, one preceding the other, as follows:

"A. There was a light looking car in front of him and it came to a stop.

"Q. You say there was another car preceding him, a light looking car, did it pass you? A. Yes.

"Q. Your car was headed east and the cars coming from 60 were headed west? A. Yes.

"Q. Now the car that preceded the car the defendant was driving you say went across and passed you? A. Yes.

"Q. It's a narrow road? A. Yes, sir.

"Q. Did you try to stop the first car? A. No, sir.

"Q. You didn't? A. No.

"Q. You didn't pay any attention to it? A. Not so much, no.

"Q. When the next vehicle came across you say it slowed but didn't stop at the stop sign and that the car passed you going west? A. Yes, sir, that's right.

"Q. You were driving your vehicle? A. Right.

"Q. Mr. Peck was a passenger with you? A. Right.

"Q. When the car that the defendant was driving passed you what did you do? A. *Well, we glanced over at him, didn't like his looks and we decided to take a look at him and he took off.*

"Q. You didn't like his looks and you turned around? A. To see what was the matter that he took off so fast.

"Q. Alright. That was the reason you didn't turn on your siren? A. When? After we turned around?

"Q. Yes. A. I certainly did because he was done breaking the speed limit.

"Q. *He wasn't breaking the speed limit when you started after him? A. No.*"

Officer Lawson testified he called Officer Peck out of bed at 4:00 a. m. and told Peck to meet him at the intersection of 60 and 66 which he did. Upon being asked if he had talked to Officer Myers (the officer from Afton) earlier that morning, he replied, "I think we met him once down at the Eagle." Then he was asked whether Mr. Myers advised him of the two cars he followed and observed there early in the morning and Officer Lawson replied, "I

don't recall." However, Officer Lawson admitted being in communication with the officer from Afton on the radio the morning of and prior to intercepting the defendant. Mr. Meyers, the officer who drove a Studebaker as described by the defendant as the car observing him in Afton, was listed as a witness but did not appear.

Defendant testified that after the officers began their pursuit he took off at a high rate of speed because he didn't know whether they were hijackers or officers. He said he stopped after hearing several gun shots. The officers admitted shooting 4 times, but said they were not aiming at the defendant. The defendant also stated that he told the officers he started to come back another way and the officer said, "It wouldn't have made any difference which way he came, they would have got him anyway." Defendant further testified that Officer Peck said he was glad that we finally got there; they had been watching about two hours and he was supposed to have gone off duty about 8 or 8:30, and mentioned something about missing his breakfast. Defendant stated he had not violated any traffic laws at the time the officers began their pursuit.

The record cannot be carefully reviewed without forming the definite opinion that the defendant's story relative to being observed by Officer Myers while airing up his tires in Afton was true; that Myers communicated this information to the other deputies who set up a trap to catch the defendant on his return trip; that they waited for his arrival approximately 4 hours; that they were stationed at the intersection of 60 and 66 for the purpose of catching defendant with a load of whiskey. Though this is denied by the arresting officers, the circumstances could lead to no other conclusion.

The failure of the State to call officers from Afton who had been endorsed as witnesses lends credit to defendant's story. Regardless of the conflict in testimony the facts are summed up in Officer Lawson's testimony that, "Well, we glanced over at him, didn't like his looks and we decided to take a look at him and he took off." Your

writer has been unable to justify the above statement as legal grounds for an arrest, a search or seizure. It would be just as sound to say, "We pursued the defendant because his hair was black or his eyes were blue and we didn't like either." No criticism is meant to be herein directed at the many previous holdings of this court to the effect that: Whether search and seizure from an automobile is reasonable is in its final analysis, to be determined as judicial question, in view of all the circumstances under which it is made, and such being so, this court will not reverse the trial court's finding upon a question of fact where there is a conflict of evidence, and there is competent evidence reasonably tending to support the trial court's finding. However, it would be meandering far from the fundamentals to make valid a search and seizure where subterfuge is obvious upon the face of the record. The exception to the fundamental prohibition against unreasonable search must never overcome the rule. This court has in numerous cases expressed a desire to carefully guard against subterfuge being the tool by which officers may ignore the necessity of a warrant or to cover up their determination to search defendant's car without complying with our laws as they pertain to search and seizure. Cases upholding this expression are numerous— see Barnett v. State, 94 Okl.Cr. 293, 235 P.2d 555; Johnson v. State, 92 Okl.Cr. 63, 220 P.2d 469.

The officers make such to-do about the defendant driving at a high rate of speed after they began pursuit. Officer Peck testified defendant reached a speed of 90 miles or better and when he overtook the defendant he informed him he was under arrest for speeding and driving reckless. It is well to bear in mind that Officer Lawson testified that the defendant was not violating the speed limit at the time they turned around and took after the defendant. The testimony reveals that the officer immediately turned on their red light, used their siren, and fired 4 shots. In view of these facts I feel that the search began when the officers performed these overt acts in stopping the defendant and this contention has heretofore been upheld in a very able decision by Judge Powell in the case of Saltsman v. State, 95 Okl.Cr. 228, 243 P.2d 737, where it was said:

"Search of a motor vehicle begins when officers move in to overhaul the driver, not necessarily when they commence to follow the suspected driver, but at the time they perform some overt act in attempting to stop him, such as sounding the siren and turning a spot light on the suspect or forcing him to the curb, or any act having for its purpose the obtaining of authority over the driver."

Therefore, this court in order to be consistent, would be compelled to hold that the search had begun when the officer turned around and turned on the red light and siren. It has long been the opinion of this court that where the search was invalid in its inception it cannot be made valid by the discovery of contraband or by what it subsequently brings to light. The search revealed that the defendant was loaded with whiskey, but this court should not let down the barriers against unlawful search and seizure if the law is not complied with in every instance. The protection afforded under the Constitutions of the State and Nation is applicable to the guilty and the innocent alike. If we should let down these barriers to apprehend the guilty, they could no longer serve to protect the innocent. This court clearly established this rule in Asbrook v. State, 92 Okl. 287, 219 P. 347, 439, wherein it is stated:

"The absolute security against unlawful search or seizure exists without reference to guilt or innocence of the person whose property or premises is searched. The mere fact that he is guilty, or that there may be reasonable grounds to believe that he is guilty of the charge preferred against him by the officer of which he is suspected will afford no excuse or justification for an unlawful search or seizure."

Sec. 30, Art. § 2 of the Constitution of this State forbids unreasonable search and

seizure, without a warrant. It has been said that the security afforded by this provision against unlawful search and seizure is the right guaranteed to the citizens even for the discovery of the citizens' sins. This right we must preserve, unless we may with impunity, disregard our oath to support and enforce the Constitution. The laws of this state are indeed clear as set forth in Tit. 22 O.S. 1951 § 196. It is provided:

"A peace officer may, without a warrant, arrest a person:

"1. For a public offense committed or attempted in his presence.

"2. When the person arrested has committed a felony, although not in his presence.

"3. When a felony has in fact been committed, and he has reasonable cause for believing the person arrested to have committed it."

The officers in the instant case attempted to justify the search and seizure by testimony of Officer Peck as follows:

"Q. Where did you see the defendant at that time and what was he doing at that time? A. The defendant crossed the highway headed west.

"Q. And passed you? A. Yes, sir.

"Q. Had he stopped at the stop sign on 66 before he crossed? A. He slowed but never come to a complete stop."

The defendant denied this and stated he stopped at the stop sign and took off at a normal speed. This appears to be uncanny in that the officers would linger in the vicinity of the intersection for approximately 4 hours and when defendant arrives he slows down but does not stop, and thereby justifies the officers in beginning immediate pursuit with red lights shining, sirens blowing and guns blazing. I cannot conceive an officer firing 4 shots in an effort to stop a vehicle that had slowed down but did not completely stop at an intersection unless they had previous knowledge of the cars' contents or a strong suspicion thereof. It is well to bear in mind that defendant was not charged with running a stop sign but with speeding. Attorneys for defense made strenuous efforts to get at the facts and in several instances were handicapped by the ruling of the trial court. A different light may have shown up on the matter had witness been required to answer the following questions by counsel for the defendant:

"A. I was not looking for any particular car.

"Q. You had no information at all when you were working on that morning with respect to any whiskey that he be hauling through?

"Mr. Gee: Objection as leading and suggestive.

"The Court: Sustained."

"Q. In the course of your employment did you have any conversation with anybody in your office or anyone else connected with the law enforcement in Afton respecting two cars described similar to the one that was leading and the one you saw?

"Mr. Gee: Objection as incompetent, irrelevant and immaterial.

"The Court: Sustained.

"Mr. Page: Exception.

"Q. Mr. Peck, are you telling this Court under oath that you were not looking for whiskey in that car when you started in pursuit?

"Mr. Gee: Objection. It has already been answered and for the further reason it is incompetent, irrelevant and immaterial.

"The Court: Sustained.

"Mr. Page: Exception.

"Q. I will ask you whether or not you suspected there was whiskey in that car at the time you started in pursuit?

"Mr. Gee: Object as being incompetent, irrelevant and immaterial and repetition.

"The Court: Sustained.

"Mr. Page: Exception. Your Honor, that is the gist of this whole proceeding.

"The Court: I think he testified to that several times.

"Mr. Page: I didn't think he testified to that.

"The Court: I sustained the objection.

"Mr. Page: Exception.

"Q. I will ask you if on the morning in question, December 14th, 1956, you were not out patrolling the roads and highways with the specific intention of stopping any cars that you might suspect of hauling whiskey?

"Mr. Gee: Objection as being incompetent, irrelevant and immaterial and repetition. It makes no difference what he was doing out there. He testified why.

"The Court: Sustained.

"Mr. Page: Exception.

"Q. I will ask you whether or not you had observed these cars, these specific cars, within 24 hours prior to the time you made this arrest?

"A. No, I hadn't observed them.

"Q. Or had no information that anybody else had observed them?

"Mr. Gee: Objection. Incompetent, irrelevant and immaterial. It makes no difference and it would be hearsay if he had.

"The Court: Sustained."

In this connection your writer is thoroughly familiar with the line of cases passed on by this court establishing a general rule that in order to reserve an available objection to the exclusion of evidence, a proper question must be asked and, on objection thereto, an offer must be made at the time, showing what evidence will be given if the witness is permitted to answer, the purpose and object of the testimony sought to be introduced, and all the facts necessary to establish its admissibility. The application of this rule while interrogating a hostile witness would constitute an ab-

surdity. How would defense counsel anticipate the answer unless it could be determined by inquiry which in the instant case was denied? It is quite evident from the record that defense counsel did not know the answer but was attempting to learn by strenuous examination of the witness. The only way the answer could have been ascertained was for the court to have permitted the witness to answer. When the objection was sustained, defense counsel would have been dwelling upon mere speculation to have dictated an answer into the record. The question herein referred to could have been answered "Yes" or "No." The questions propounded on in the record, your writer is of the opinion they were competent and should have been answered. The only reason for the rule mentioned heretofore is to record the substance of the expected answer so this court might determine its admissibility. Where the question could be answered with a single "Yes" or "No," this court needs no record to determine its admissibility. *If the questions were competent the answers would likewise be admissible.* Defense counsel was gambling with the fate of his client as the answer could have been favorable or unfavorable to the defendant. There are numerous exceptions to the general rule that the forbidden answer must be dictated into the record to preserve a review. It is stated in 3 C.J. 827, § 737:

"The rule requiring an offer of evidence is, however, subject to some exceptions * * * Nor does the general rule apply to a question asked upon the cross-examination of a witness called by his adversary. *And where a question is in itself proper and pertinent, the facts expected to be proved by the witness need not be stated in order to make the ruling rejecting the evidence available on appeal.*" See also 4 C.J.S. Appeal & Error § 291.

Obviously the deciding factor was whether the officers were acting in good faith relative to minor traffic violations or whether they were using that testimony as a subterfuge to justify an otherwise illegal

491

search. Therefore, the questions were proper and of tremendous importance and their answers should have been welcomed by the trial judge as being most helpful in deciding the paramount issue of subterfuge. If they had previous information of defendant's vehicle and were waiting for him to appear, expecting him to be loaded with whiskey and had not obtained a warrant, the trial judge could clearly assume a clear case of subterfuge, if not the defendant's contention would have been tremendously weakened. This court has heretofore held as recited in the majority opinion that where defendant files a motion to suppress, the burden rests on him to offer evidence in proof of the allegations contained therein. However, your writer is of the opinion that since the defendant is in most instances compelled to rely upon hostile witness, usually developing into a swearing match between the defendant and arresting officers, he should be given broad latitude within the rules of evidence to establish his theory.

By sustaining objection to these material questions, the defendant was handcuffed in his effort to prove his contention of subterfuge.

In view of the previous holdings of this court, to the effect that the trial court's findings on a motion to suppress, will not be disturbed where there is any competent testimony to support it, the trial judges should be most cautious and approach the solution with thoroughness and finality. In the Brinegar case, supra [97 Okl.Cr. 299, 262 P.2d 477], Judge POWELL quotes with approval from Wallace v. State, 49 Okl.Cr. 281, 294 P. 198, where it was said:

"This court will not uphold an unreasonable search where it appears that one illegally arrested on some subterfuge for the purpose of justifying or attempting to justify a search otherwise unlawful. If the arrest is unlawful, the search is unlawful."

This, in the opinion of your writer is good law and should have been followed in the case at bar and the motion to suppress consequently sustain Your author is of the opinion the court handicapped the defense in sustaining objections to the questions heretofore prepounded and committed reversible error in so doing. I am of the firm opinion that a rehearing should be granted in said cause, and the majority opinion withdrawn for further consideration.